**FILED**

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

UNFOLDMENT, INC.
RICARDO J. and BRYAN W. ~~devlin~~
546 Newcomb Street, S. E.
Washington, D. C. 20032
**Plaintiffs**

v.

**DISTRICT OF COLUMBIA**
**JOHN OPPEDISANO,**
*individually and in his official capacity*
**JAMES OSBOURNE,**
*individually and in his official capacity*
**ERNESTINE JONES**
*individually and in her official capacity*
**MILTON GRADY**
*individually and in his official capacity*
**SONDRA JACKSON**
*individually and in her official capacity*
**HARRY BLACK,**
*individually and in his official capacity*
**OTHER UNKNOWN DISTRICT OFFICIALS**
*individually and in their official capacities*
**Defendants**

**Civil Action No.**
**JUDGE**

Case: 1:07-cv-01717
Assigned To : Oberdorfer, Louis F.
Assign. Date : 9/26/2007
Description: Civil Rights-Non-Employ.

JURY ACTION

## COMPLAINT

*(Violations of the Civil Rights laws of the United States and the Common
Law of the District of Columbia, to wit: Unlawful Discrimination Based Upon Plaintiff's Race
(African-American) and Sex (Female) through the Unlawful Denial of Opportunity to Make and
Enforce Contracts; Unlawful Retaliation for the Prior Exercise of Plaintiff's Protected Civil
Rights through the Unlawful Denial of Opportunity to Make and Enforce Contracts; Conspiracy
to Interfere with the Lawful Opportunity to Make and Enforce Contracts Based Upon Race, Sex
and the Prior Exercise of Protected Civil Rights; Denial of Constitutional First Amendment and
Due Process Rights and Liberty Interests; Violations of Other State Claims brought under the
Court's Supplemental Jurisdiction, including: Tortious Interference with Business Relationships,
Tortious Interference with the Reasonable Expectation of Prospective Economic Advantage;
Intentional and Negligent Infliction of Emotional Distress; Breach of Oral and Quantum Meruit
Contracts, Detrimental Reliance and Other Related State Claims)*

COMES NOW UNFOLDMENT, INC., Ricardo J. and Bryan W. et alia, the Plaintiffs in

this action, by and through counsel, and hereby file a Complaint in this proceeding as a related

case to U.S. District Court for the District of Columbia Civil Action 00-0539 Mintz v. District of

Columbia and in support thereof state as follows:

## PARTIES

1.      Plaintiff Unfoldment, Inc. (hereinafter "Unfoldment" or "the nonprofit"), a Ward 8-

based 501 (c) (3) nonprofit organization, has been organized in the District of Columbia since

1977.  During its 30-year history, Unfoldment successfully managed more than twelve million

dollars in federal, local and private contracts and grants.  Unfoldment has received awards for its

outstanding work with District children and families from Presidents Ronald Reagan, George H.

Bush, and Bill Clinton, the Mayor and City Council, the D. C. Police Department, D.C. Superior

Court Pretrial Services Agency, Department of Corrections, elementary, junior high and high

school principals, universities, churches, civic associations and bar associations.

2.      Independent experts retained by the U.S. District Court for the District of Columbia

evaluated Unfoldment's groundbreaking prison-based drug treatment program and found it be

among the best in the nation. (See: Harrington v. D.C.  741 F. Supp 968 (1990)).

3.       The U.S. Congress Select Committee on Narcotics Abuse and Control toured

Unfoldment's program and found it be "a national model, worthy of replication."  Unfoldment's

Executive Director was invited to testify before Congress as an expert on prison-based substance

abuse programs.

4.      Three Chief Judges of the D. C Superior Court, two D. C. Police Chiefs, prominent

members of the media and City Council are among a host of outstanding individuals who have

volunteered to serve on Unfoldment's honorary Board of Directors over the years.

2

5.    Based on the community's confidence, Unfoldment is the only group home provider in the District's history to obtain unanimous support for zoning variances to open group homes for juvenile offenders in residential neighborhoods from three different Advisory Neighborhood Commissions.

6.    Unfoldment's three-member Board of Directors is composed of Kemi Morten, an African-American woman (hereinafter "Ms. Morten") and Baker Morten (hereinafter "Mr. Morten"). At all times relevant herein, Ms. Morten was a resident of the District of Columbia and served as Unfoldment's General Counsel, Executive Director and co-founder. A former Emmy award winning broadcast television and radio journalist for WMAL, Channel 7 (now WJLA), author and filmmaker, Mr. Morten founded Unfoldment in 1977 in the Barry Farm community of southeast Washington, D. C. At all times relevant herein, Mr. Morten was a resident of the District of Columbia.

7.    Plaintiffs Ricardo J., Bryan W. et alia at all times relevant herein were youths placed by the District of Columbia Child and Family Services Agency at Unfoldment's program when the contract ended. Wards of the foster care system for most of their lives, these boys endured multiple placements and foster care drift. They strongly objected to being removed from Unfoldment where they had established close familial ties with each other and with Unfoldment staff. Plaintiffs bring their complaint under 42 U.S.C. 1983 and the Fifth Amendment of the U.S. Constitution, alleging that the District operated its child welfare system in violation of the federal Adoption Assistance and Child Welfare Act of 1980 and Child Abuse Prevention and Treatment Act. Plaintiffs also allege that the District violated its own statutes: the Prevention of Child Abuse and Neglect Act of 1977 and the Youth Residential Facilities Licensure Act of 1986.

8.    Defendant the District of Columbia is subject to suit for the discriminatory and

3

unconstitutional acts of employees and/or agents of the District of Columbia Child and Family Services Agency (hereinafter "CFSA" or "the Agency"). In addition, the District of Columbia is the employer of persons who allegedly committed various violations of state law regarding Plaintiffs and engaged in other actionable acts and/or omissions within the course and scope of their employment. Therefore, the District of Columbia is liable pursuant to the doctrine of respondeat superior.

9.      Defendant John Oppedisano is a Caucasian-American male who was the head of the LaShawn General Receivership Office of Grants, Contracts and Procurements (hereinafter "Contracting Branch") responsible for managing Unfoldment's contract (hereinafter "Mr. Oppedisano"). Recently, the U.S. District Court for the District of Columbia ruled that at all times relevant to these proceedings Oppedisano engaged in racially discriminatory and sexually graphic conduct and created a racially hostile work environment within the CFSA contracting branch for African Americans. Mr. Oppedisano is sued in both his personal and official capacities in this lawsuit for reasons herein below set forth.

10.      Defendant James Osbourne is a Caucasian-American male who worked in the contracting branch (hereinafter "Mr. Osbourne"). Mr. Osbourne did not have a supervisory position. However, he was treated like a supervisor responsible for Unfoldment's contract. Recently, the Court ruled that at all times relevant to these proceedings Mr. Osbourne engaged in racially discriminatory and sexually graphic conduct and created a racially hostile work environment within the CFSA contracting branch for African Americans. Mr. Osbourne is sued in both his personal and official capacities in this lawsuit for reasons herein below set forth.

11.      Defendant Ernestine Jones is an African-American female who was appointed by current U.S. District Court Chief Judge Thomas F. Hogan as the LaShawn General Receiver for

4

CFSA at all times relevant to these proceedings (hereinafter "the Receiver" or "Ms. Jones"). Ms Jones is sued in both her personal and official capacities in this lawsuit for reasons herein below set forth.

12.    Defendant Milton Grady is an African-American male who served as CFSA Deputy Receiver at all times relevant to these proceedings (hereinafter "Mr. Grady"). Mr. Grady is sued in both his personal and individual capacities in this lawsuit for reasons set forth below herein.

13.    Defendant Sondra Jackson is an African-American female who served as CFSA Deputy Receiver at all times relevant to these proceedings (hereinafter "Ms. Jackson"). Ms. Jackson is sued in both her personal and individual capacities in this lawsuit for reasons set forth below herein.

14.    Defendant Harry Black is an African-American male who served as Chief Financial Officer at all times relevant to these proceedings (hereafter "Mr. Black"). Mr. Black is sued in both his personal and individual capacities in this lawsuit for the reasons set forth below herein.

## JURISDICTION

15.    This case originated in the D. C. Contract Appeals Board (hereafter "Board") as a dispute between Unfoldment and CFSA over the terms of a contract to provide a 30-bed traditional group home program for older teenage boys with histories of substance abuse and delinquency. The contract, awarded following a competitive bid process, consisted of a base year in the amount of $1.7 million followed by four option years.

16.    In 1998, following a series of contract breaches by CFSA contracting branch chief John Oppedisano, Unfoldment complained of unfair treatment and asked CFSA General Receiver Ernestine Jones to investigate.

17.    After an exhaustive investigation, in June 1998, CFSA determined that "certain

5

unnamed Agency contracting officials held an unreasonable hostility toward Unfoldment."

18.    Despite repeated requests from Unfoldment, Defendants refused to disclose the names of the hostile officials or the nature of their hostility, and Unfoldment had no means of determining this information.

19.    Four months later, Defendants opted not to renew Unfoldment's contract.

20.    In December 1998, Unfoldment appealed the Agency's decision to the Board claiming, among other things, that CFSA materially breached the contract during the base year and terminated the contract in bad faith. In 2001, the District moved to dismiss Unfoldment's appeal. Without affording Unfoldment an opportunity for discovery, in March 2002, the Board dismissed all but one of Unfoldment's claims – for outstanding invoices. Unfoldment appealed the Board's decision to the D. C. Court of Appeals.

21.    There, the District argued that it exercised an option not to renew Unfoldment's contract consistent with its right to do so under the express terms of the contract.

22.    Unfoldment countered that CFSA materially breached the contract in bad faith *during the first contract year* before its unilateral option right arose. Unfoldment acknowledged that the contract contained a nonrenewal option, but claimed that Agency officials unlawfully exercised the nonrenewal option in bad faith.

23.    On October 20, 2006, the D. C. Court of Appeals reversed and remanded the Board's decision, ruling that Unfoldment is entitled to recover the minimum order requirement set forth in the contract.

24.    The Court also ruled that Unfoldment has the right to sue the District for three additional causes of action:  breach of contract, breach of contract in bad faith and breach of a quantum meruit action. Unfoldment, Inc. v. D.C. Contract Appeals Board 909 A.2d 204 (2006).

6

25.    While preparing for litigation following remand, Unfoldment discovered the May

2006 decision in Mintz v. D.C. 2006 U.S. Dist. LEXIS 34446. [1]

---

[1] Oppedisano "referred to Plaintiff Mintz and other African-Americans, including other African-American employees of the agency, as 'niggers' and 'dumb ass niggers.'"

Oppedisano told Mintz that "'[y]ou are just like the rest of these people here – a dumb ass nigger.'"

Oppedisano, in the presence of both plaintiffs, referred to another employee as a "Muslim nigger.'" Oppedisano made other racist remarks in the workplace.

After Mintz began to protest the racial comments, Oppedisano and Osbourne began to harass Mintz, arguably in an attempt to provoke him to anger. These comments included vulgar sexual and racial references. For example, Osbourne asked Mintz whether, as a "tall, Black man" he "liked having it up the ass."

In the restroom, Oppedisano said to Mintz, "I like it anal, Reginold, don't you want to give it to me? You're a black stud." Oppedisano also sexually propositioned Mintz on other occasions.

In addition, on one occasion Osbourne picked up a picture of Mintz's son on his desk, and told Mintz that Osbourne "liked having sex with boys." Osbourne also asked Mintz whether he "liked boys."

At this point Darbeau interceded and took Mintz for a walk around the block so that he would calm down.

As a result of the foregoing facts, the "work environment caused particular distress to the African-American females in the unit, one of whom was Muslim."

In response, both plaintiffs reported the behavior of Oppedisano and Osbourne to Farouk Hosein, who was Oppedisano's direct supervisor.

Following the sexual comments described above, Mintz `reported Oppedisano to the Agency's Intake and Assessment Desk, which is where employees filed complaints.

Mintz was assured that someone would take action, but no action in fact occurred. On November 15, 1996, Mintz filed a formal EEO complaint with the Agency. Mintz was immediately placed on

26.     In <u>Mintz</u>, U.S. District Court Judge Louis Oberdorfer found that at all times relevant to these proceedings, CFSA contracting branch chief John Oppedisano and his second in command James Osbourne held an egregious racially discriminatory animus against African-Americans and created a racially hostile workplace within the contracting branch.

27.     Since 1998, Unfoldment had claimed that John Oppedisano and other CFSA contracting branch officials materially breached Unfoldment's contract, and did so in bad faith in an attempt to undermine and terminate the nonprofit's contract. Here, in graphic detail was the first evidence of a racially discriminatory motive for their actions.

28.     "A discriminatory atmosphere at a plaintiff's place of employment may serve as circumstantial evidence of individualized discrimination.  While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add color to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff." <u>Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987); Miller v. Prosoco, Inc., 1994 U.S. Dist. LEXIS 12603 (D. Kan. Aug. 2, 1994).</u>

29.     In carefully examining an employer's proffered legitimate, nondiscriminatory reasons for failing to promote a Title VII plaintiff, the Court must consider the decision within the context of the employer's general attitude towards members of the plaintiff's protected class. Courts have recognized that "a discriminatory atmosphere [at a plaintiff's place of employment] . . . could serve as circumstantial evidence of individualized discrimination." <u>Parker v. Secretary,</u>

---

administrative leave.  The Director of Personnel, Mary Montgomery, testified that the person *under investigation* is normally placed on administrative leave – **not** the person who filed a complaint. [*Emphasis added*].

On November 21, 1996, the Receivership sent a termination letter to Mintz.

<u>United States Dep't of Housing and Urban Dev., 282 U.S. App. D.C. 17, 891 F.2d 316, 322 (D.C. Cir. 1989)</u>.

30.     Considering the facts of this case against the backdrop of the <u>Mintz</u> findings, it is reasonable to infer that Oppedisano and Osbourne were the contracting branch officials whom Defendants identified in 1998 as having an unreasonable hostility toward Unfoldment.

31.     As Oppedisano and Osbourne's supervisors, Defendants Jones, Grady, Black and Jackson knew or should have known that Oppedisano and Osbourne were the contracting branch officials whom the Agency identified as harboring unreasonable hostility toward Unfoldment. Yet, they withheld this information from Unfoldment.

32.     Moreover, based on the findings of fact and conclusions of law in the <u>Mintz</u> case, it is also reasonable to infer that Oppedisano and Osbourne's hostility toward Unfoldment was racially motivated.

33.     Defendants Jones, Grady, Black, and Jackson knew or should have known that Oppedisano and Osbourne's hostility toward Unfoldment was racially motivated.  Yet, Defendants took no remedial action.

34.     Instead, Defendants Jones, Grady, Black, and Jackson, acting pursuant to an agreement or conspiracy, withheld Oppedisano and Osbourne's identities and the racially discriminatory nature of their hostility in an effort to conceal this information from Unfoldment, thereby depriving Unfoldment of equal privileges and immunities under the law.

35.     Indeed, as late as May 2006, when the <u>Mintz</u> case was published, Defendants continued to conceal probative, undisputed evidence of racial discrimination at the highest levels of the Agency's contracting branch from Unfoldment, the Board and the D. C. Court of Appeals.

36.     As a result, neither the D.C. Court of Appeals nor the D. C. Contract Appeals Board

considered this newly discovered evidence prior to rendering their decisions.

37.    Unfoldment will prove at trial that CFSA Contracting Officer John Oppedisano and his deputy James Osbourne materially breached Unfoldment's contract and orchestrated its nonrenewal in a racially discriminatory manner in violation of 42 U.S.C. 1981.

38.    Unfoldment will also prove at trial that Mr. Oppedisano and Mr. Osbourne's supervisors Defendants Jones, Black, Grady, and Jackson, acting pursuant to an agreement or conspiracy to conceal the racially discriminatory conduct of Oppedisano and Osbourne, deprived Unfoldment of equal privileges and immunities under the law in violation of 42 U.S.C. 1985.

39.    These issues raise federal questions that fall within the jurisdictional purview of this Court, and this matter is brought before this Court, <u>inter alia</u>, pursuant to Sections 1981 of the Civil Rights Act of 1964, as amended.

40.    The bases of the Civil Rights claims raised herein against the named Defendants include alleged violations of Title 42, United States Code, Section 1981(a), to wit: "All persons...shall have the same right... to make and enforce contracts...as are enjoyed by white citizens..." To "make and enforce contracts" includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship," as applied through Title 42, United States Code, Section 1983."

41.    "If a corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981" <u>Thinket Ink Information Resources, Inc., v.</u> <u>Sun Microsystems, Inc. 368 F.3d 1053 (2004); Hudson Valley Freedom Theater, Inc. v.</u> <u>Heimbach, 671 F. 2d 702, 706 (CA2 1982).</u>

42.    Additional jurisdiction of the Court for Unfoldment's allegations of emotional

distress, humiliation and other harm as a result of being discriminated against on the basis of race is brought under Title 42, United States Code Section 1981.

43.    Additional jurisdiction of the Court for various conspiratorial acts alleged against Defendants John Oppedisano, James Osbourne, Ernestine Jones, Sondra Jackson, Milton Grady, and Harry Black is based upon Title 42, United States Code, Section 1985 (3), which prohibits unlawful conspiracies to deprive persons of the "equal protection of the laws."

44.    Additional jurisdiction of the Court for punitive damages for conspiratorial acts alleged against Defendants John Oppedisano, James Osbourne, Ernestine Jones, Sondra Jackson, Milton Grady, and Harry Black is based upon Title 42, United States Code, Section 1985 (3), which prohibits unlawful conspiracies to deprive persons of the "equal protection of the laws."

45.    Additional jurisdiction of the Court for Defendant District of Columbia's violation of Plaintiff Unfoldment's constitutionally protected due process and liberty interests is based upon the Fourteenth Amendment of the United States Constitution as applied to the District of Columbia through the Fifth Amendment.

46.    Allegations that the Defendant District of Columbia wrongfully breached its promise to pay rent to store government inventory at Unfoldment's group homes and to execute a new contract with Unfoldment and Unfoldment's reliance thereon to its detriment under a quantum meruit contract; unjust enrichment, oral contract, or detrimental reliance theory are based upon equitable state claims of the District of Columbia, brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code Sections 1981 and this Court's supplemental jurisdiction under Title 28, United States Code Section 1367.

47.    Allegations that the Defendant District of Columbia wrongfully revoked Unfoldment's real property tax exemption and for attorney's fees to defend against such action

11

are based upon the common law of the District of Columbia, brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code Sections 1981 and this Court's supplemental jurisdiction under Title 28, United States Code Section 1367.

48.    Allegations based on newly discovered evidence in the <u>Mintz</u> case, that Defendants negligently breached the rights of Ricardo J., Bryan W. and other youths housed at Unfoldment are based upon the D. C. Prevention of Child Abuse and Neglect Act and the Youth Residential Facilities Licensure Act which explicitly provide these children with a private cause of action to sue under the Prevention of Child Abuse and Neglect Act, 42 U.S.C. 1983, and the Due Process Clause of the U.S. Constitution as applied to the District of Columbia, and the U.S. Constitution.

49.    Allegations of tortious interference with Unfoldment's prospective economic advantage are based upon the common law of the District of Columbia, brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code Section 1981 and this Court's supplemental jurisdiction under Title 28, United States Code Section 1367.

50.    Allegations of negligent and/or intentional infliction of emotional distress are based upon the common law of the District of Columbia and D.C. Code 12-309 brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code Section 1981 and this Court's supplemental jurisdiction under Title 28, United States Code Section 1367.

51.    Allegations of violations of Unfoldment's right to contract in a fair procurement process are brought herein under the Fifth and Fourteenth Amendment of the U.S. Constitution as discussed in <u>Trifax Corp. v. District of Columbia 53 F.Supp.2d 20 (1999).</u>

52.    Recovery of attorneys' fees and costs, as demanded herein, is authorized pursuant to Title 42, United States Code, Section 1988, providing for recovery of attorney fees by successful plaintiffs in cases involving violations of Title 42, United States Code, Sections 1981.

12

**Supplemental Jurisdiction**

53.    Unfoldment brings the remanded quantum meruit [2], unjust enrichment, and related

state contract claims under this Court's supplemental jurisdiction.

54.    While the D.C. Contract Appeals Board has jurisdiction to resolve the remanded

breach of contract and breach of contract in bad faith claims, administrative agencies lack

inherent equitable power to adjudicate the quantum meruit claims.  See Ramos v. District of

Columbia Dep't Consumer and Regulatory Affairs, 601 A.2d 1069, 1073 (D.C. 1992).

55.    The Superior Court and by supplemental jurisdiction, the U.S. District Court have

jurisdiction over Unfoldment's quantum meruit claims.  D.C. Code Section 11-921 (a)(6).

Therefore, this Court has jurisdiction to hear Plaintiff's federal question claims and related state

claims.  City of Chicago v. International College of Surgeons, 522 U.S. 156, 165-66, 118 S.Ct.

523, 139 L. Ed. 2d 525 (1997).

**VENUE**

56.    Venue is appropriate in this forum pursuant to 28 U.S.C. Section 1391(a), as the

events occurred in the District of Columbia.

**ADMINISTRATIVE PREREQUISITES**

57.    On April 30, 2007, Unfoldment filed a timely notice of intent to file a claim for

damages arising under 42 U.S.C. 1981 and 1985 and under the District of Columbia tort claims

act, and related state claims.  On September 7, Unfoldment served the attached D.C. Code

Section 12-309 notice of intent to sue on  D. C. Mayor Adrian Fenty by certified mail receipt

number 7007 1490 0002 4072 2982, return receipt requested. (Exhibit 1)

---

[2]  Quantum meruit is an equitable remedy, which permits recovery by a party for services or materials
provided – despite the absence of an express contract – if the defendant accepted the goods or services
under circumstances, which gave reasonable notice that the plaintiff expected payment for them.  Prince
Construction Co., Inc. v. D. C. Contract Appeals Board,892 A.2d 380 (2006)

13

## QUALIFIED IMMUNITY IS NOT A BAR TO PLAINTIFF'S CLAIMS

58.     Qualified immunity shields government officials from civil damages incurred in the performance of a discretionary function 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396,407 (1982).

59.     In anticipation of Defendants' perfunctory motion to dismiss on the ground of immunity, case law in this jurisdiction is well settled. Immunity issues cannot be resolved on a motion to dismiss. District of Columbia v. Pizzulli, 917 A.2d 620 (2007).

60.     Whether CFSA managerial employees were acting within the scope of their official duties as agents of the Receiver is a question of fact, to be resolved by a judge or jury after "weigh[ing] the pertinent factors and discern[ing] where the appropriate balance of interests lies." Moss v. Stockard, 580 A.2d 1011, 1021 (D.C. 1990); cf. Johnson v. Weinberg, 434 A.2d 404, 407 (D.C. 1981) (directed verdict is appropriate only if "the probative facts are undisputed"; otherwise "'the wise course is for the trial judge to allow the case to go to the jury" (citations omitted)).

## THE MINTZ CASE IS RELATED AND ITS FINDINGS ARE LAW OF THE CASE

61.     Mintz v. the District of Columbia is related to this case because evidence in the two cases derives from a common nucleus of operative facts, and demonstrates a disturbing pattern and practice of harassment, discrimination and retaliation by Defendants.

62.     The Court's findings of fact in Mintz establish, inter alia, that at all times relevant to these proceedings:

a.  Reginold Mintz and Selwyn Darbeau, like Unfoldment, were African-American CFSA contractors whose contracts were supervised by Defendants John Oppedisano and his deputy James Osbourne.

b. Defendants Oppedisano and Osbourne held an egregious racially discriminatory animus toward African-Americans, created a racially hostile workplace environment at CFSA for African American employees and contractors and discriminated against Mr. Mintz.

c. Oppedisano and Osbourne held high-level supervisory positions with authority to terminate the contracts of African-American contractors.

d. After Mintz filed his complaint of racial discrimination against Oppedisano and Osbourne, CFSA terminated Reginold Mintz's contract while Oppedisano and Osbourne retained their positions of authority in the Agency's contracting branch.

63.    The <u>Mintz</u> findings regarding Defendants Oppedisano and Osbourne are law of the case based on several well-established doctrines which bar a trial court from reconsidering the same questions of fact and law that were presented to and decided by another judge of coordinate jurisdiction. <u>Pannell v. District of Columbia 829 A.2d 474, 477 (2003), Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996).</u>  "The policy against permitting a party to change its position according to its present interests is well recognized." <u>Prince Constr. Co., Inc. v. D. C. Contract Appeals Board, 892 A.2d 380 (2006).</u>

## <u>THE STATUTE OF LIMITATIONS IS NOT A BAR TO THESE PROCEEDINGS</u>

64.    For purposes of triggering the statute of limitations on a 1981 claim, the accrual date of the claim is not necessarily the date that plaintiff actually was injured; rather it is the date that plaintiff discovered his injury. <u>Payne v. Abbot Laboratories, 999 F.Supp. 1145 (N.D. Ill. 1998).</u>

65.    Prior to discovering the <u>Mintz</u> case, Unfoldment certainly suspected that CFSA contracting branch officials were trying to undermine the Unfoldment program.

66.    In fact, from the very beginning of the contract in July 1997 until the District opted not to renew in October 1998, Unfoldment repeatedly complained to Receiver Ernestine Jones that Mr. Oppedisano and other contract branch officials not only breached material contract terms, but also treated Unfoldment unfairly.

67.    High ranking CFSA officials knew that certain unnamed contracting branch officials

15

had an unreasonable hostility toward Unfoldment; however, they concealed their identities and the discriminatory nature of their hostility from Unfoldment.

68.     Long after the May 2006 ruling in <u>Mintz</u>, the District of Columbia continued to conceal highly probative evidence of Oppedisano and Osbourne's discriminatory conduct from Unfoldment and the D.C. Court of Appeals in an apparent violation of <u>Rule 3.3 of the District of Columbia Rules of Professional Conduct</u>.[3]

69.     "It is a familiar rule of evidence that "a party having control of information bearing upon a disputed issue may be given the burden of bringing it forward and suffering an adverse inference from failure to do so." <u>Alabama Power Co. v. Federal Power Comm'n, 167 U.S. App. D.C. 145, 511 F.2d 383, 391 n. 14 (D.C. Cir. 1974)</u>; *see also* <u>International Union, UAW v. NLRB, 148 U.S. App. D.C. 305, 459 F.2d 1329, 1336 (D.C. Cir. 1972)</u> ("**when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him**").    See also <u>McCormick, EVIDENCE §</u> 337 at 787 (2d ed. 1972).   In regulatory proceedings, placing such a burden on the regulated firm, where the relevant information concerns its operations and management, has become part of the "common lore" of regulation.  <u>Commonwealth of Puerto Rico v. FMC, 152 U.S.App.D.C. 28, 36, 468 F.2d 872, 880 (1972)</u>.

70.     Having had no opportunity for discovery over the past nine years of this litigation, Plaintiff's recent discovery of the <u>Mintz</u> Court's findings of racial misconduct by Unfoldment's former contracting officers was entirely serendipitous.

71.     "The three-year statute of limitations applicable to plaintiff's 1983 race discrimination claim arising from alleged preselection based on the race of an African American

---

[3] Rule 3.3 of the D.C. Rules of Professional Conduct prohibits, among other things, a lawyer from knowingly making a false statement of fact or law to a tribunal or failing to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

to the position of Deputy Director of Emergency Ambulance Bureau of D. C. Fire Department did not begin to run until the plaintiff obtained through discovery documents referring to the preselection." Zervas v. D. C. 817 F. Supp. 148 (D.D.C.1993).

72.     "Until that time, the plaintiff could not reasonably have known the facts surrounding preselection, since the person had been appointed "acting" Deputy Director, and the fire department solicited applications for the post." Zervas v. D. C. 817 F. Supp. 148 (D.D.C. 1993).

73.     Thus, Defendants cannot successfully claim that these proceedings are barred by the statute of limitations since Plaintiff did not discover the prohibited discriminatory conduct of Defendants Oppedisano and Osbourne – *and* the apparent concealment of that conduct by Defendants Jones, Black, Grady, and Jackson, until after the 2006 Mintz opinion was published.

74.     "Plaintiff's allegation that defendants concealed the preselection through a sham application process is sufficient to support tolling the statute of limitations." Zervas v. D. C. 817 F. Supp. 148 at page 151 (D.D.C. 1993) citing Richards v. Mileski 662 F.2d 65, 69-70 (D.C. Cir. 1981).

75.     "Civil rights claim under 1983 begins to accrue when the aggrieved party knows or has reason to know of the injury which is the basis for the claim. U.S. ex rel. Long v. SCS Business & Technical Institute, 999 F.Supp. 78, reversed 173 F.3d 870, 335 U.S. App.D.C. 331, opinion supplemented 173 F.3d 890, 335 (1998).

76.     "Though the law of fraud does not endorse a hear no evil, see no evil approach, neither does it require that an aggrieved party must have proceeded from the outset as if he were dealing with thieves." Hudak v. Economic Research Analysts, 499 F.2d 996, 1002 (5th Cir. (1974).

## FACTS OF THE CASE

### The LaShawn Receivership[4]

77.    In 1989, the American Civil Liberties Union brought a class action on behalf of abused and neglected children in the District of Columbia's foster care system. The named plaintiff, LaShawn A., four years old at the time of filing, had been in "emergency" foster care for two and a half years, even though D.C. law mandates that a child can remain in emergency care no longer than 90 days.

78.    During this two-and-a-half-year period, DHS never developed an adequate case plan for her. The Department planned to return LaShawn home but failed to provide her mother with services to ensure a successful reunification. The Department also failed to provide LaShawn with needed psychological services.

79.    LaShawn and six other named plaintiffs alleged that the defendants – the Mayor and other high-level District officials – were responsible for widespread violations of their rights under the U.S. Constitution, various federal statutes and local laws.[5]

80.    Two weeks of trial testimony revealed the District's deficient and inept administration of its foster care system. The testimony, and more than a thousand admissions of

---

[4] The LaShawn litigation was a federal class action against the District of Columbia and some of its officials on behalf of certain abused and neglected children in the city's child welfare system. The United States District Court concluded that the District had mismanaged its supervisory operations and deprived the children of various rights under federal and local statutes. See generally LaShawn A. v. Barry, 330 U.S. App. D.C. 204, 144 F.3d 847 (1998); LaShawn A. v. Kelly, 887 F. Supp. 297 (D.D.C. 1995); LaShawn A. v. Dixon, 762 F. Supp. 959 (D.D.C. 1991). On January 27, 1994, the District Court issued a remedial order instructing the District to improve its management of the child welfare system. See LaShawn A. v. Kelly, 887 F. Supp. at 298; see also LaShawn A. v. Kelly, 301 U.S. App. D.C. 49, 56, 990 F.2d 1319, 1326 (1993), cert. denied, 510 U.S. 1044, 114 S. Ct. 691, 126 L. Ed. 2d 659 (1994) (affirming judgment in favor of plaintiff class based on local statutory law). On May 22, 1995, the court held that the District's efforts to comply were inadequate and warranted the establishment of a full receivership to operate the District's child welfare system, including the CFSA.

[5] Under District law, children reported to have been abused or neglected have a private right of action to enforce the District's Prevention of Child Abuse and Neglect Act. Turner v. D.C. 532 A.2d 662 (D.C. 1987). In addition, the Youth Residential Facilities Licensure Act explicitly provides these children with a private cause of action to sue under the Prevention of Child Abuse and Neglect Act.

fact by the District, showed that District officials consistently failed to carry out responsibilities imposed on them by federal and local laws. <u>LaShawn A. v. Dixon, 762 F.Supp. 959, 960, 986-87 (D.D.C. 1991)</u>

81.    In November, 1993, current Chief Judge Thomas F. Hogan entered an 84-page Remedial Order, agreed to by the parties after a period of negotiation, which detailed reforms the District had to make in 18 areas in its foster care system.   Among other things, the Order required the District to develop community-based services in mental health, substance abuse, and housing assistance

82.    Fifteen months after issuing the Remedial Order, in February 1995, three -year old Rhonda M. was beaten, strangled and burned with cigarettes by her teenaged cousin, Morris, who was later convicted of involuntary manslaughter.  Morris had earlier admitted to biting Rhonda's older sister and breaking her arm, however, the city's lawyers, declined to prosecute him.

83.    Judith Meltzer, the court-appointed monitor hired by Judge Hogan concluded that the D. C. Corporation Counsel and six other D.C. government agencies made mistakes contributing to Rhonda's "avoidable death."

84.    Judge Hogan stripped the District government of all authority for running CFSA, becoming the first federal judge in the nation's history to take complete judicial control of a local child protection agency.  Judge Hogan appointed Jerome G. Miller as the Agency's first General Receiver.

85.    In September 1996, Miller established an independent procurement branch within the Receivership, hiring Farouk Hosein as Deputy Director for Finance and Administration and Harry Black as Chief Financial Officer for the Agency.

86.     Mr. Hosein hired John Oppedisano, James Osbourne, Reginold Mintz, and Selwyn Darbeau as contract specialists.

87.     Existing Department of Human Services (hereafter "DHS") staff transitioned in to assist with procurement included Steve Wilson, and Christine Wheeler, among others.

88.     John Oppedisano was promoted to Contracting Officer with supervisory authority over all the other contract specialists.

89.     According to the Court's finding in the <u>Mintz</u> case, although James Osbourne did not have a supervisory position, Mr. Oppedisano treated him as his second in command.

### Outgoing Receiver Jerome Miller Awards Contract to Unfoldment

90.     Miller quickly implemented broad new initiatives in keeping with Judge Hogan's Remedial Order including establishing and funding community-based collaboratives, relocating social workers from a centralized, downtown location to underserved areas, like Ward 8, and creating new procurement standards and policies designed to bring in new foster care contractors with innovative approaches.

91.     These changes were designed to improve conditions for children in the District's foster care system.

92.     Miller's tenure lasted approximately two years.  In one of his last acts of office, following an open bid process, Receiver Jerome Miller found Unfoldment's proposal to be within the competitive range and asked the nonprofit to submit a best and final offer (BAFO) to provide a five-year traditional group home program.

93.     Submitting a BAFO was the middle point between filing a proposal and contract award, giving the Agency and the bidder a chance to clarify the contract requirements and affording the bidder one final opportunity to submit its best prices and terms to meet those

requirements.

94.    The only bidder headquartered in Anacostia, Unfoldment offered one of the largest

programs – a 30-bed traditional group home program for older boys with histories of substance

abuse and dual jackets in the juvenile justice system.

95.    Unfoldment proposed to house the youths in five age-appropriate group homes

located in Ward 8 and on a 37-acre Virginia farm, 90 miles outside the District.

96.    As with all bidders, CFSA contracting officials required Unfoldment to include in

the BAFO copies of leases for each of the six proposed facilities covering *all five years of the*

*multi-year contract* to ensure that, in the event of contract award, Unfoldment would have

sufficient facilities available to house all 30 youths for the entire five-year period.

97.    CFSA required Unfoldment to state how much time it would take to complete start-

up and to provide a date by which CFSA could begin to place clients in the event of an award.

98.    Start-up included among other things the following tasks:  arranging for all necessary

D.C. Department of Consumer and Regulatory Affairs, Fire Department and other required

inspections of each District group home; securing certificates of occupancy for all District

facilities; fully equipping all homes (including furniture and furnishings, computers, linen,

cookware, appliances, televisions and other needed items); recruiting, interviewing, screening

and hiring staff and providing two weeks of in-service staff training prior to the placement of

CFSA clients.

99.    In its BAFO, Unfoldment submitted the estimated start-up date and proposed to

recover all start-up costs by amortizing them over the five-year contract period.

100.    CFSA accepted all the terms set forth in the BAFO, and Unfoldment's BAFO was

listed as one of eleven attachments that CFSA incorporated by reference into the Contract.

## CFSA Impeded Unfoldment's Right to Contract in a Fair Procurement Process in Bad Faith and for Racially Discriminatory Reasons

101.    The Court soon appointed Ernestine Jones to replace Jerome Miller as General Receiver.  Ms. Jones hired Sondra Jackson as Deputy Receiver for Programs and Milton Grady as Deputy Receiver for Operations.

102.    The General Receiver's authority was extraordinarily broad and uniquely autonomous, eclipsing that of any other agency in the District's history.

103.    The United States District Court granted the General Receiver "all necessary authority to carry out its responsibilities, including but not limited to *any and all authority previously vested in the Office of the Mayor or any other executive branch of the government of the District of Columbia.*" [6]

104.    The decision whether to renew a contract or seek new contracts rested squarely in the discretion of the Agency and necessarily involved the exercise of the contracting officer's values and recommendations.

105.    As the highest-ranking officials in the contracting branch, Contracting Officer John Oppedisano and his deputy James Osbourne wielded enormous influence and unparalleled authority over Agency contractors, the procurement processes and contracting branch staff.

106.    Mr. Oppedisano supervised the day-to-day operation and management of hundreds of million of dollars of CFSA contracts and strongly influenced the Agency's determination of which contracts were renewed and terminated.

107.    Based on the undisputed facts in the Mintz case, John Oppedisano and James

---

[6] See LaShawn A. v. Kelly, 887 F. Supp. at 316.  Moreover, the Court vested the appointed receiver with "direct control and line supervisory authority over all activities and tasks relating to members of the *LaShawn* class," including "full authority to ... designate and assign all necessary administrative, direct service, and support staff, including hiring personnel directly and all other personnel actions deemed necessary by the Receiver to carry out the Court's [remedial and implementation] orders."

Osbourne possessed an egregiously racially discriminatory animus and created a hostile work environment that violated the rights of African American contractors and staff.

108.    Mr. Oppedisano and Mr. Osbourne harassed Reginold Mintz based on his race.

109.    After Mr. Mintz filed his EEO complaint, John Oppedisano terminated Mintz's contract while preserving his own position of authority and that of his deputy James Osbourne within the Agency's contracting branch.

110.    Defendants Jones, Grady, Black and Jackson supervised Oppedisano and Osbourne and knew or should have known about their discriminatory conduct yet took no remedial action

111.    In a similar manner and for racially discriminatory reasons and in bad faith, Mr. Oppedisano and Mr. Osbourne deceptively executed Unfoldment's contract, materially breached its terms; harassed, hindered and undermined Unfoldment's ability to perform the contract; countenanced overzealous inspections; suspended client referrals to Unfoldment, and maliciously circulated a defamatory evaluation report on Unfoldment, successfully recommending that CFSA not renew Unfoldment's contract.

*i.  CFSA Contracting Officer James Osbourne Deceptively Executed Unfoldment's Contract*

112.    On June 5, 1997, Defendant James Osbourne called to inform Unfoldment that it had won a new traditional group home contract with CFSA.

113.    Defendant Osbourne stated that the Receivership was required to submit all contracts exceeding $1 million to the D.C. Control Board[7] for approval prior to execution.

114.    Osbourne faxed a one-page contract award letter to Unfoldment Executive

---

[7] In early 1995, Clinton Administration officials and Members of Congress developed the Financial Responsibility and Management Assistance Act, which Congress passed promptly and the President signed on April 17, 1995. The Act created the District of Columbia Financial Responsibility and Management Assistance Authority ("D. C. Control Board") a new entity of the D.C. Government, and charged it with reviewing and approving budget requests of the D.C. Government, ensuring that they reflect a four-year path to a balanced budget; and all borrowing requests, certain leases and contracts, and most legislation adopted by the D.C. Government.

Director with instructions to sign and return it.

115.    Once approved, Osbourne assured Unfoldment, the parties would sit down to negotiate the contract.

116.    Unfoldment signed and returned the cover sheet to Mr. Osbourne.

117.    In the meantime, Receiver Jerome Miller abruptly resigned, and the Court appointed Linda Bayless as Interim Receiver.

118.    Sometime later, Mr. Osborne mailed the executed cover sheet signed by Ms. Bayless on behalf of the Agency.

119.    However, instead of scheduling contract negotiations as expected, Defendant Osbourne attached a 21-page unsigned document, entitled "Articles" which Unfoldment had never seen before, delineating the contractual relationship between the parties.

120.    The Articles listed eleven additional documents, none of which were attached thereto, which were incorporated by reference into the contract.

121.    Unfoldment filed a formal objection with CFSA officials, stating that Unfoldment would not agree to be bound by those provisions of the proposed contract which were inconsistent with its BAFO.

### ii. CFSA Inappropriately Placed Children at Unfoldment, Endangering Clients and Staff

122.    In July 1977, CFSA began placing boys at Unfoldment, and within a few months the program earned praise for reducing the number of positive drug test results, improving school attendance and reducing the number of runaways.

123.    CFSA had several categories of group home providers including traditional and therapeutic group homes.

124.    Therapeutic group home providers receive special training and higher compensation

24

than traditional group home providers because their clients present serious psychiatric and emotional disorders, including, animal cruelty, predatory sex offenses and arson.

125.    These youths often required medication and specialized wrap around services (a staff person assigned solely to work with one individual child for up to 16 hours a day).

126.    Unfoldment was a traditional group home services, not a therapeutic placement and did not have the specialized staff and resources to serve such youths.

127.    Yet, the District routinely placed youths with severe psychiatric and emotional disorders, including arson, animal cruelty and predatory sex offenses at Unfoldment.

128.    These youths usually arrived at Unfoldment without medication and medical records.

129.    Contracting Officer John Oppedisano flatly denied Unfoldment's written requests for wrap around services, ordering Unfoldment to accept the children or face termination under the contract's "non-refusal" provisions.

130.    Mr. Oppedisano relented, only after a D. C. Superior Court judge ordered the Agency to provide wrap around services for a youth placed at Unfoldment.

131.    To meet the child's special needs, Unfoldment retained a psychiatrist and full-time wrap around services staff at a cost of $67,000; Unfoldment also hired a special education teacher to provide onsite educational services for them at an additional cost.

132.    Unfoldment filed equitable adjustment requests and change orders with the Contracting Officer to recover these unbudgeted expenses; Mr. Oppedisano did not approve any of them.

133.    CFSA also breached the contract by routinely placing older juvenile offenders with pre-existing segregation orders in the same Unfoldment group home, endangering the youths, other clients and Unfoldment staff.

134.   CFSA improperly assigned youths under the age of 12 (and as young as five years old) to the same Unfoldment group home with older sex offenders, then criticized Unfoldment for reassigning them to age-appropriate placements without first obtaining Agency approval.

### iii.  CFSA Failed to Provide Essential Records for Children Placed at Unfoldment

135.   The contract required CFSA to send (at the time of placement or within a specified period thereafter) critical records for each child placed at Unfoldment including individualized educational plans, case summaries and plans, psychological evaluations, birth certificates, Medicaid cards and other documents essential to their well-being. The Agency knew that students could not attend public school without certain of these records.

136.   However, CFSA routinely placed youths at Unfoldment without such records and did not provide them for months following their placement or did not provide them at all.  To avoid their languishing at the group home (and out of the classroom) for months at a time, Unfoldment tracked down and obtain copies of the records and provided them with private onsite education in the interim.

137.   Unfoldment promptly submitted equitable adjustment invoices for these unbudgeted, additional costs which CFSA did not approve for payment.

### iv.  CFSA Failed to Order Minimum Required Under Contract and Denied Unfoldment's Requests for Change Orders

138.   From the outset, Unfoldment and CFSA differed on the manner of payment due under the contract.  Unfoldment claimed that the contract required CFSA to pay a per diem based on the number of clients referred each month _or_ a minimum invoice amount, whichever amount was greater.

139.   Contracting Officer Oppedisano asserted that invoice payments to Unfoldment were based only on the _actual number of youths referred each month._

140.    If the Agency placed no children at Unfoldment in a given month, he argued, CFSA had no obligation to pay Unfoldment any money at all.

141.    Mr. Oppedisano also insisted that the contract required Unfoldment – at all times -- to maintain a capability to accept the maximum number of referrals set forth in the contract -- 30 youths.

142.    Unfoldment formally objected in writing to Mr. Oppedisano's payment methods and submitted two sets of invoices – one based on the actual number of referrals and the other based on the minimum order requirement for the duration of the contract.

143.    Eight years later, the D. C. Court of Appeals agreeing with Unfoldment, ruled that CFSA breached Unfoldment's contract by failing to order the minimum number of clients (50% of the maximum contract referrals).

144.    Unfoldment also submitted separate invoices to reimburse the nonprofit for certain unbudgeted costs such as wrap around services, change orders and equitable adjustments. Contracting Officer Oppedisano denied every equitable adjustment and change order submitted by Unfoldment.

145.    "Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change." Aydin Corp. (West) v. Widnall, 61 F.3d 1571, 1577 (Fed. Cir. 1995). Therefore, the Government breaches its contract if it fails to grant the contractor an equitable adjustment when the contract is constructively changed. See id.

    *v.  CFSA Refused to Pay Unfoldment's Invoices for Services Rendered*

146.    CFSA exercised sole authority for administering its huge contracting budget, yet routinely claimed that it did not have sufficient funds to pay Unfoldment's approved invoices.

147.    This practice went on for months at a time, creating a serious cash flow problem for the nonprofit which was often unable to meet its obligations.

*vi. CFSA Overzealously Inspected Unfoldment in Retaliation for Filing Child Abuse Report*

148.    Unfoldment's relationship with CFSA contracting branch officials deteriorated after Unfoldment's Executive Director reported an incident of child abuse to the Metropolitan Police Department ("MPD").

149.    While interviewing applicants for employment, two staff members of another CFSA contracted group home stated that they were looking for new jobs because staff routinely physically assaulted children as a means of punishment. Unfoldment's Executive reported the incident to John Oppedisano and heard nothing further.

150.    Later, a child was placed at Unfoldment after having been discharged from the same group home. That child alleged that he had been taken into a room, beaten by staff and locked in the room, alone, for hours.

151.    As required by D.C. law, Ms. Morten immediately filed a written report of the alleged abuse with the MPD and sent a copy to Mr. Oppedisano and to Receiver Ernestine Jones.

152.    Soon, Unfoldment received the first of what would become an inundation of site visit inspections from contracting branch monitors.

153.    Prior to the report, contracting branch monitors inspected Unfoldment's group homes once a month.   After the police report, inspections soared to as many as 12 times a month.

154.    CFSA increased its inspections in this manner for the improper purpose of threatening, intimidating and causing financial harm to Unfoldment, Inc.

*vii. CFSA Omitted Program Accomplishments from Contracting Branch Monthly Reports*

155.    Unfoldment often received letters from judges, social workers, parents and guardians ad litem citing significant improvements in behavior, academics and drug testing among program participants and shared copies of the letters with the monitors during the site visits.

156.    No teen referred to Unfoldment was rearrested on new charges nor tested positive for substance abuse during the entire period of Unfoldment's contract with CFSA.

157.    The Youth Services Administration commended Unfoldment on having the most "graffiti-free" group homes in the District and invited Unfoldment staff to train other group home operators on how to reduce graffiti by wards of the District.

158.    Yet, none of the positive achievements that Unfoldment shared with the contracting branch appeared in the monitors' monthly reports.

159.    Instead the monitors focused entirely on relatively minor "contract deficiencies" such as "dust behind the sofa" "adding doilies to the coffee table", "inadequate number of laundry hampers" and "missing towel racks".

### viii. CFSA Suspended Referrals to Unfoldment While Continuing Referrals to Other Group Home Providers with Far More Serious Violations

160.    In February 1998, Contracting Officer John Oppedisano issued a Notice to Cure letter to Unfoldment based on 82 deficiencies cited by contract branch monitors during their site visits.

161.    However, 64 of the "deficiencies" were for personnel records and client files that Mr. Oppedisano had not previously requested.

162.    For that reason, they could not be termed "deficiencies" under the terms of the contract, and Unfoldment objected to their characterization as such.

163.    Many of the remaining deficiencies involved replacing windows and doors which *less than six months earlier* had been approved by the CFSA and DCRA during Unfoldment's certificate of occupancy application inspections – simply because the windows and doors had detachable screens.

164.    Without prior notice, Contracting Officer John Oppedisano suspended all client

referrals to Unfoldment group homes.

165.    The notice to cure letter and suspension of referrals was patently unfair because the deficiencies cited at Unfoldment did not pose a threat to the health and welfare of the children and were relatively minor when compared to more far disturbing contract violations at other CFSA-contracted group homes.

166.    CFSA contracting branch officials knew or should have known about these violations; however, Mr. Oppedisano did not stop referring clients to those providers.

167.    For example, CFSA officials were notified that at one CFSA-contracted group home for teen-aged girls, a male counselor had impregnated a teenaged client.

168.    Neither John Oppedisano nor any CFSA supervisory personnel suspended client referrals to that group home provider.

169.    CFSA was notified by Unfoldment that counselors at a CFSA-contracted group home physically assaulted children in their care; again, neither John Oppedisano nor his supervisors suspended referrals to the provider.

170.    An Unfoldment employee who worked part-time at another CFSA contracted group home reported that CFSA contract monitors were aware of a gaping hole in the roof so large that when it rained, water poured inside; yet CFSA never suspended referrals to that provider's program.

### ix.  Contracting Officer John Oppedisano Promises Not to Terminate Contract if Unfoldment Corrects Deficiencies; Reneges on Promise

171.    Facing severe financial constraints caused by the Agency's refusal to pay invoices and suspension of referrals, upon receiving the February 1998 cure letter, Unfoldment Executive Director wrote a letter of objection to John Oppedisano.

172.    Mr. Oppedisano assured Ms. Morten that if Unfoldment spent the money to correct

30

the deficiencies CFSA would not terminate the contract.

173.    Mr. Oppedisano assured Unfoldment that CFSA would make available technical assistance to assist Unfoldment in addressing the cure letter items.

174.    Unfoldment's Executive Director asked Mr. Oppedisano to document in writing their conversation that if Unfoldment expended the money to replace the doors and windows and cured the other deficiencies, CFSA would not terminate Unfoldment's contract.

175.    In a February 26, 1998 letter, the Contracting Officer confirmed the agreement in writing.

176.    Relying on Mr. Oppedisano's written assurance, Unfoldment ordered the new windows and doors and proceeded to cure the deficiencies.

### x.  Contract Branch Encouraged Social Workers to Make Negative Comments About Unfoldment

177.    However, the Contracting Officer was not acting in good faith.

178.    As early as March 1998, CFSA social workers began to complain to Unfoldment that they were receiving calls from Mr. Oppedisano's staff encouraging them to raise complaints about Unfoldment.

179.    These social workers explained that they were pleased with their clients' care at Unfoldment but that they had been called to a meeting by their supervisors to discuss "concerns" about Unfoldment.

180.    They also complained of pressure from their superiors to find something bad to say about Unfoldment.

181.    Fearful of reprisals, these CFSA employees asked that their names not be mentioned in correspondence with the agency.

182.    Sometime later, concerned CFSA personnel, including social workers, informed

Unfoldment staff that they were being *directed* by the contracting branch to find other placements for youths on their caseload because Unfoldment's contract was being terminated.

### xi.  Contracting Branch Undermined Unfoldment's Relationship with Its Own Staff and Clients

183.    Unfoldment's own staff and clients complained that CFSA contract officials solicited negative comments from them during their many site visits.

184.    These rumors quickly spread, causing severe stress for Unfoldment, its staff and clients Bryan W. and Ricardo J.

185.    One Unfoldment staffer complained that a CFSA social worker approached him about forming a company to compete for Unfoldment's contract, based on the social worker's understanding that the contracting branch planned to terminate Unfoldment 's contract and award the newly formed company a purchase of services contract to care for Unfoldment's former clients.

186.    Unfoldment filed a formal written complaint with CFSA Receiver Ernestine Jones alleging unfair treatment and breach of contract by the head of the Agency's contracting branch John Oppedisano and his staff.

187.    Defendant Jones met with Unfoldment officials; shortly thereafter CFSA officially suspended all referrals to Unfoldment.

188.    Unfoldment appealed the suspension and requested a formal investigation.

### xii.  Contracting Branch Refuses to Resume Referrals after Unfoldment Cures Deficiencies

189.    Contracting Officer Oppedisano did not provide the promised technical assistance; nevertheless, CFSA contracting officials determined that Unfoldment corrected all cited deficiencies and timely satisfied all terms of the Notice to Cure letter.

190.    Despite this achievement, social workers continued to tell Unfoldment that contracting branch officials were directing them to move their clients from Unfoldment, because the Unfoldment contract would not be extended.

191.    CFSA continued to suspend client placements to Unfoldment, and by this time, the number of youths placed at Unfoldment's 30-bed program had fallen sharply.

### Unfoldment Asks Receiver Ernestine Jones to Investigate the Contracting Branch

192.    As the financial situation grew worse, for the second time, Unfoldment asked the Receiver to investigate Unfoldment's complaints of unfair treatment by John Oppedisano and his contracting staff.

193.    In June 1998, the Receiver dispatched an inspection team composed of senior CFSA officials to investigate – not the contracting branch – but Unfoldment.

194.    Over a period of weeks, the inspection team thoroughly examined all aspects of Unfoldment's operations by conducting site visits and interviewing clients, guardians ad litem, CFSA social workers and Unfoldment staff and consultants.

195.    The team carefully audited all of Unfoldment's client files, progress reports, financial, personnel, invoice, tax and administrative records.

### xiii. Independent CFSA Investigation Team Determines that Unnamed CFSA Contracting Officials Are Unreasonably Hostile to Unfoldment

196.    In approximately mid-June, the CFSA inspection team called a meeting with Unfoldment officials to share the results of their investigation.

197.    The meeting, held at Unfoldment's headquarters, was attended by Unfoldment Director Kemi Morten, Unfoldment Founder Baker Morten, Unfoldment attorneys Brian Lederer and Howard Teller and other Unfoldment staff.

198.    The team determined that Unfoldment's group homes ranked among the Agency's best in terms of appearance, cleanliness, and recordkeeping.

199.    The inspectors expressed difficulty in reconciling their observations with those of contracting branch monitors.

200.    The inspection team acknowledged that the Agency, under tremendous pressure to find placements for them, inappropriately placed children at Unfoldment who required services beyond the scope of a traditional group home setting.

201.    Then the inspection team made a startling admission -- that as part of their investigation, they had "determined that certain contract branch officials held an unreasonable hostility toward Unfoldment".

202.    Ms. Morten asked for the names of the contracting branch officials who were "unreasonably hostile toward Unfoldment".

203.    The team members refused to reveal their identities.

*xiv. Contracting Branch Secretly Circulated Defamatory Report Recommending Nonrenewal of Unfoldment Contract*

204.    The inspection team also disclosed that, without notice to Unfoldment, the contracting branch had recently circulated an extremely negative evaluation report recommending that CFSA not extend the contract because the Unfoldment program was not serving the best interests of the children and in some cases was harming them.

205.    By circulating the report without Unfoldment's knowledge and without affording Unfoldment an opportunity to refute its defamatory content, Defendants abridged Unfoldment's constitutionally protected right to contract in a fair procurement process in violation of the Fifth and Fourteenth Amendment of the U. S. Constitution. Trifax Corp. v. District of Columbia, 53 F. Supp. 2d 20 (1999).

34

206.    Moreover, Defendants undermined Unfoldment's right to a fair procurement process in bad faith and for racially discriminatory reasons.

207.    Unfoldment Executive Director immediately requested a copy of the report.

## CFSA Rejects Contracting Branch Report; Resumes Referrals and Takes Steps to Renew Unfoldment's Contract

208.    Team members declined to release the report, stating that they did not concur with the report's findings.

209.    The inspectors noted that they found no basis for the contracting branch evaluation report.

210.    There being no basis for the report, they concluded, the Agency would immediately resume referrals to Unfoldment.

211.    CFSA Program Officer Christine Wheeler informed Unfoldment that the Agency would exercise its option to continue the contract for another year as either an emergency care or traditional group home

212.    Unfoldment documented Ms. Wheeler's statements in a subsequent letter and hand delivered the letter to the General Receiver.

213.    In the letter, Unfoldment asked the Agency to correct any statements that were inconsistent with their recollection; CFSA never responded.

214.    Within days of the inspection team's findings, Receiver Ernestine Jones resumed client referrals to Unfoldment, overruling the recommendations set forth in the contracting branch report.

215.    The Agency's resumption of client referrals to Unfoldment following the investigation team's evaluation of the Unfoldment is compelling evidence that the inspectors *rejected* the June 1998 contracting branch report conclusions.

35

216.    Presumably, had the inspectors found any basis for the report, they would **not** have referred children to Unfoldment because in doing so, the Agency would have knowingly and unlawfully placed children in a harmful environment.

217.    The Agency's decision to resume placing children at Unfoldment is clear evidence that, consistent with their statements to Unfoldment, the investigative team determined that Unfoldment performed its contract satisfactorily.

218.    Six months later, the Agency reiterated those findings, stating that Unfoldment "in fact, did carry out its contract and fulfilled all necessary requirements."

219.    Soon after meeting with Unfoldment, Program Officer Wheeler asked the nonprofit to submit a proposed budget for the first option year, which Unfoldment timely submitted.

220.    Later, Ms. Wheeler called Ms. Morten to advise that she had determined that emergency care services could be provided under Unfoldment's existing contract.

221.    On June 29, 1998, CFSA faxed to Unfoldment a <u>Bilateral Contract Modification,</u> amending the contract to exercise a partial contract option year from July 1, 1998 through September 30, 1998 (according to Agency officials for the purpose of conforming Unfoldment's fiscal year to the District's). Unfoldment executed the partial the option year contract.

### Adverse Contract Branch Report Previously Rejected by CFSA Investigators Resurfaces

222.    Unexpectedly, in September 1998, the adverse June 1998 resurfaced when CFSA mailed a copy to Unfoldment.

223.    The report (which had been widely disseminated for three months prior to its submission to Unfoldment) contained erroneous, malicious and defamatory statements about the Unfoldment program.

224.    Unfoldment immediately filed a written point-by-point refutation and demanded that

36

the Agency rescind the report and reissue correct findings.

225.    Unfoldment again asked the Agency to disclose the names of the contracting branch officials found by the investigation team to have an unreasonably hostility toward Unfoldment and the nature of their hostility; CFSA again refused to provide that crucial information.

226.    In late September CFSA executed a second partial option year contract with Unfoldment for the period October 1 to October 31, 1998, -- this time (according to the Agency) to allow CFSA sufficient time to review the June 1998 contracting branch report.

### Receiver Ernestine Jones Opts Not to Renew Unfoldment Contract

227.    On October 28, 1998, citing directly from the contracting branch report, the Receiver opted not to renew Unfoldment's contract effective December 28, 1998.

228.    Unfoldment is the **only** group home provider awarded a contract under the solicitation whose contract was not renewed by CFSA.

229.    CFSA opted to renew the contracts of all other group home providers that were issued a contract under the solicitation with Unfoldment, *including those group home providers alleged to have physically and sexually abused children in their care.*

### Unfoldment Files Complaint with D.C. Contract Appeals Board

230.    Unfoldment filed a formal complaint with the Board on December 7, 1998, claiming that certain unnamed CFSA contracting officials materially breached the contract and did so in bad faith with the intent of undermining Unfoldment's contract.

231.    At that point, Unfoldment had no knowledge of Oppedisano and Osbourne's racially discriminatory animus and had no reason to believe that the Agency's actions were racially motivated.

232.    In January 1999, the Receiver Ernestine Jones moved to dismiss Unfoldment's appeal, claiming exemption from the Board's jurisdiction based on her status as an independent receiver appointed by the U.S. District Court.

### CFSA Admits in Legal Documents that Unfoldment Performed Contract Satisfactorily

233.    In documents filed with the Board, Receiver Ernestine Jones reiterated that Unfoldment satisfactorily performed its duties under the contract.

234.    The Receiver emphasized that her nonrenewal decision was not based on any fault of Unfoldment.

235.    Rather, CFSA admitted that it had inappropriately placed children at Unfoldment and claimed that the Agency executed contract modifications with Unfoldment so that it might "transition the inappropriate placements to more appropriate facilities."

236.    The Agency asked the Board to suspend its proceedings to allow Unfoldment to exhaust administrative remedies with CFSA.

237.    Following Agency procedures, Unfoldment filed essentially the same claims with CFSA Receiver Ernestine Jones.

238.    CFSA immediately proposed that the parties execute a new contract and asked Unfoldment to submit a budget for the new contract.

239.    The practice of executing a contract with a provider following contract termination is permitted under CFSA regulations and the District's procurement laws and was a common business practice at CFSA largely because of the unique skills and knowledge of such contractors and the scarcity of licensed group homes available to house CFSA clients.

**District's Use of Group Homes Entitles Unfoldment to Recover Compensation**

240. CFSA notified Unfoldment that because it intended to renew the program, there was no need to remove government purchased property valued in the tens of thousands of dollars from Unfoldment's group homes only to move it back when the new contract was executed.

241. Unfoldment informed CFSA that it expected to be paid fair market rental for the property so long as the property was stored at the group homes and submitted a written schedule listing the rent to be charged for each group home during the storage period; CFSA did not object to the rental amounts.

242. Relying upon the District's promise, Unfoldment permitted the District to store its property at Unfoldment's facilities beginning January 1, 1999.

243. In reliance upon promises and assurances of a new contract made to Unfoldment by CFSA senior officials, the nonprofit made significant investments in preparing budgets, recruiting staff, maintaining Unfoldment's group homes, and taking other material steps to enable it to be in a position to receive new clients from CFSA.

244. Plaintiff missed numerous opportunities to rent its group home facilities and to explore other business opportunities, in reliance on the promises and assurances of Defendants who knew or should have known that Unfoldment relied thereon.

245. To prevail on a quantum meruit theory of recovery, a plaintiff must demonstrate that it rendered valuable services to defendant, which services were accepted and enjoyed by the defendant under such circumstances as reasonably notified defendant that plaintiff, in performing such services, expected to be paid. Fred Ezra Co. v. Pedas, 682 A.2d 173, 176 (D.C. 1996) (quoting TVL Assocs. v. A&M Constr. Corp., 474 A.2d 156, 159 (D.C. 1984).

**Court-Appointed Receiver Jones is Arrested; Receivership Ends**

246.    In 2001, following a number of deaths of children in her custody, CFSA Receiver Ernestine Jones was arrested by U.S. Marshals for violating a Superior Court Judge's order to appear and answer questions regarding the care of a child.

247.    The Receivership ended shortly thereafter, and CFSA reverted back to the control of the Mayor the District of Columbia.

248.    The District refused to honor the Receiver's promise to enter into a new contract with Unfoldment and asked the Board to dismiss Unfoldment's appeal.

**Board Dismisses Unfoldment's Breach of Contract Claims**

249.    Unfoldment opposed the motion and filed an Amended Complaint on October 18, 2001.

250.    On November 30, 2001, CFSA moved to dismiss or in the alternative for summary judgment which Unfoldment opposed.

251.    On March 20, 2002, the Board dismissed Unfoldment's appeal on all grounds except Unfoldment's claim for outstanding invoices, simple interest and Quick Payment interest.

252.    Unfoldment timely filed a petition for review of the Board's decision with the District of Columbia Court of Appeals.

253.    CFSA continued to store its property at Unfoldment's group homes, despite repeated requests from Unfoldment to remove it.

254.    During the storage period, individuals apparently attracted to the valuable property inside, vandalized two group homes, causing extensive damage in and outside the property.

**The District Continues to Engage in a Pattern and Practice of Cover-Up and Retaliation Against Unfoldment**

255.    Since the departure of General Receiver Ernestine Jones, CFSA has had a number of directors and interim directors, including Dr. Olivia Golden, Brenda Donald, Uma Ahluwalia and the present head of the Agency, Dr. Sharlynn Bobo.

256.    From December 1998 until the present, Agency officials knew or should have known about the racially discriminatory animus of Contracting Officer John Oppedisano and James Osbourne; yet the Agency withheld that information from Unfoldment, the Board and the D.C. Court of Appeals.

257.    Defendant District of Columbia continues to retaliate against Unfoldment for pursuing its lawful rights as exemplified by Unfoldment's preclusion from government contracts.

258.    In 2002, the District revoked Unfoldment's real property tax exemption on the grounds that Unfoldment's group homes were not being used for an exempt purpose.

259.    Unfoldment objected based on the District's continued use of the properties as storage space.

260.    From 2002 through 2006, the District continued a pattern of retaliation against Unfoldment and its officers by refusing to restore the nonprofit's real property tax exemption, imposing new tax liens on Unfoldment's two properties and scheduling the group homes for tax sale.

261.    At Unfoldment's request, the D.C. Council intervened, directing the Mayor to cancel the tax sales by enacting the "Unfoldment Inc. Equitable Real Property Tax Relief Act of 2006" and the "Unfoldment Inc. Tax Relief Emergency Act of 2007".

262.    Despite the Council's actions, the District currently refuses to restore Unfoldment's property tax-exempt status and continues to impose real property taxes on the two group homes.

**Court of Appeals Reverses Board; On Remand, Unfoldment Discovers Indisputable
Evidence of Contracting Officer 's Bad Faith and Racially Discriminatory Animus**

263.    On October 30, 2006, the D.C. Court of Appeals reversed and remanded the Board's

decision, ruling that Unfoldment may sue the District for breach of contract, bad faith breach of

contract and breach of quantum meruit contract.

264.    In 2007, while preparing for litigation following remand, Unfoldment discovered the

startling facts in Mintz v. District of Columbia.

265.    The Court's findings of racial discrimination by Unfoldment's Contracting Officer and

his deputy Jim Osbourne shed light on the Agency's inexplicable decision to terminate a program

which, by all accounts, was well run and had a successful track record in rehabilitating teenaged

male delinquents with substance abuse histories.

266.    Contracting Officer John Oppedisano and his staff discriminated against Unfoldment

and impeded Unfoldment's right to contract in a fair procurement process in violation of D.C. v.

Trifax Corp. 53 F.Supp.2d 20 (1999).

267.    Moreover, their actions resulted in the nonprofit's loss of the remainder of a valuable

five-year contract.  Unfoldment lost a competitive edge and was precluded from securing future

government contracts.

268.    Also, Unfoldment's premier and longstanding reputation among D. C. Superior Court

judges and in the community was severely damaged.

269.    While recommending renewal of Agency contracts with questionable group home

providers, Defendants Oppedisano and Osbourne  orchestrated the Agency's decision to terminate

the highly regarded Unfoldment program.

270.    The District argues that it simply exercised its right not to renew Unfoldment's

contract.  However, the District's opt-out right is not absolute.  The government has a duty to

42

exercise good faith and may not exercise its nonrenewal option in bad faith. <u>Tecom, Inc. v.</u> <u>United States 66 Fed. Claims 736 (2005).</u>

271.    Defendants breached the duties of good faith, fair dealing and the implied duty to cooperate and not to hinder Unfoldment's performance of the contract. Taken together, such conduct constitutes actionable bad faith. <u>Tecom, Inc. v. United States 66 Fed. Claims 736 (2005)</u>[8].

272.    Moreover, Defendants did so for racially discriminatory reasons. For purposes of Unfoldment's 42 U.S.C. 1981 claim, the familiar McDonnell Douglas burden-shifting framework imposed upon plaintiffs who bring claims of intentional discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e to 2000e-17 (2000) (as amended) is applicable.

273.    Under <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973),</u> a plaintiff must establish her prima facie case by showing that she belongs to a protected class traditionally discriminated against in the workplace, that she was adequately qualified, but despite her qualification, she received adverse treatment, and that similarly situated, non-protected employees did not receive similar treatment. See <u>id. at 802.</u>

274.    The defendant in turn may rebut plaintiff's prima facie case simply by producing some legally sufficient evidence of a legitimate, nondiscriminatory reason for the adverse treatment. See <u>Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-56 (1981).</u>

---

[8] Over the last few decades the Supreme Court has been less willing to presume good faith, particularly on the part of government actors. In the Equal Protection area, where the presumption of good faith is still indulged, the Court has not required any heightened burden of proof to rebut it. See, *e.g.,* <u>Grutter v. Bollinger, 539 U.S. 306, 329 (2003), Miller v. Johnson, 515 U.S. 900, 916 (1995).</u> In the closely-analogous circumstance of state or local officials accused of violating civil rights under color of law -- cases in which improper intent is an issue and qualified immunity applies -- the Supreme Court rejected judicial efforts to impose a heightened "clear and convincing evidence" standard of proof. <u>Crawford-El v. Britton, 523 U.S. 574, 594-601 (1998).</u> Tecom gave the last rites to the "irrefragable proof" standard previously applied to claims involving breach of the duties of good faith and fair dealing by government officials.

275.    If the defendant meets this burden of production, then the plaintiff must show by a

preponderance of evidence that the legitimate reasons offered by the defendant are mere pretext.

Id. at 255-56; McDonnell Douglas, 411 U.S. at 804-05.

276.    To show pretext of race discrimination, a plaintiff must produce evidence that

reasonably supports a finding of discriminatory animus.  Intent may be established by inference

as well as by direct proof.

277.    Judge Oberdorfer's finding that Oppedisano and Osbourne possessed such an animus

is law of the case and cannot be disputed by Defendants.

278.    Presented with such evidence, a reasonable jury will find that Defendants

Oppedisano and Osbourne's unfair and bad faith treatment of Unfoldment was racially motivated

in violation of 42 U.S.C. 1981.

279.    Although a prima facie case combined with disproof of the employer's explanations

does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer

intentional discrimination, and thus preclude summary judgment for the employer.  The

factfinder's disbelief of the reasons put forward by the defendant may, together with the elements

of the prima facie case, suffice to show intentional discrimination, Miller v. Prosoco, Inc., 1994

U.S. Dist. LEXIS 12603 (D. Kan. Aug. 2, 1994).

**CFSA Supervisory Personnel Were Aware of, Condoned and Concealed Discrimination**

280.    Defendants Oppedisano and Osbourne's supervisory personnel Jones, Black,

Jackson, and Grady knew or should have known that Oppedisano and Osbourne occupied

positions of authority that enabled them to undermine Unfoldment's contract directly and/or

indirectly, through others.

281.    Moreover, Defendants were aware of Oppedisano and Osbourne's despicable racial

discrimination against Reginold Mintz and knew or should have known of their hostility toward

Unfoldment; yet they concealed those facts from Unfoldment in violation of 42 U.S.C. 1985.

282.    Defendants Jones, Black, Grady, and Jackson supervised Oppedisano and Osbourne;

as such, they should have taken steps to remedy or prevent a racially hostile or offensive work

environment of which they knew or, in the exercise of reasonable care should have known.

283.    Instead, as in the Mintz case, by failing to take remedial action, Oppedisano and

Osbourne's supervisors both participated in and condoned their racially discriminatory actions

against Unfoldment.

284.    This offending conduct was not the product of chance, mistake, or ignorance. It

manifested itself in one of the most pernicious ways possible: by depriving Unfoldment of the

right to perform its contract in a decent environment.

285.    Because management level employees took no action to redress the racial harassment

of which they knew they are liable individually, and the District of Columbia must also be held

liable. Meritor Savings Bank v. Vinson, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). [9]

### The District Government Recently Renewed Option Year Contract with Law Firm That D.C. Auditor Found Grossly Overbilled District Taxpayers

286.    The District overzealously monitored Unfoldment, refused to pay for critically

needed services for abused and neglected children, and after determining that Unfoldment

performed well, opted not to renew the contract in bad faith and for racially discriminatory

reasons.

287.    By contrast, the District treated a law firm responsible for the baseball stadium

---

[9] E.E.O.C. v. Hacienda Hotel, 881 F.2d 1504 (9th Cir. 1989). EEOC guidelines recommend that an employer's remedy should be "immediate and appropriate." 29 C.F.R. § 1604.11(d). [16] Employers have a duty to "express[] strong disapproval" of harassment, and to "develop[] appropriate sanctions." 29 C.F.R. § 1604.11(f). An employer's action is appropriate where it "fully remedies the conduct without adversely affecting the terms or conditions of the charging party's employment in some manner." EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), para. 3103, at 3213 (1988).

45

litigation quite differently.

288.    In a scathing June 1, 2007 report, the D.C. Auditor found that Venable, Baetjer and Howard, LLP (hereafter "Venable") billed District taxpayers almost ***three times*** the amount set forth in its legal services contract.

289.    Incredibly, the District opted to renew Venable's contract for two more years.

290.    The government originally awarded a contract to Venable in 2005 for one year plus four option years, at no more than $950,000 annually to represent the city in eminent domain litigation regarding property taken from D. C. residents to build the new baseball stadium.

291.    During the first contract year, Venable submitted invoices totaling nearly $1.2 million — $250,000 more than the contract called for.   By that point, the District had already paid the firm $945,000, raising no questions about the invoices.

292.    In the second year of its contract Venable associate billing rates were capped at an already generous $268 an hour, yet they were billing between $285 and $310 an hour.

293.    The City Auditor found that from November 2006 until March 2007, Venable *over-billed the city more than $200,000 for improper and inappropriate charges*.[10]

294.    Yet the city kept paying — no questions asked, until the money ran out and the D. C. Auditor launched an investigation.

295.    The D.C. Auditor found that the D.C. Office of the Attorney General did **not** monitor the contract to ensure the firm's billings were appropriate.  See Auditor's Report at page 6.

296.    In stark contrast, District contracting officials over-monitored Unfoldment's contract and refused to pay invoices for services to the District's most vulnerable citizens – abused and neglected children.

---

[10] Letter Report: Auditor's Preliminary Findings From Examination of Contract Between the Office of Contracting and Procurement and Venable, Baetjer and Howard LLP, Office of the District of Columbia Auditor dated June 1, 2007 (hereafter "Auditor Report").

297.    Contractors working with developmentally disabled residents fared no better. U.S. District Court Judge Ellen Segal Huvelle recently threatened to incarcerate District officials for failing to protect the health and safety of almost 2,000 developmentally disabled residents under the District's care. Evans v. Fenty  480 F. Supp 2d 280.

298.    In that litigation, the District admitted that the rates paid to contracted providers of group homes for developmentally disabled residents are too low and have been frozen *__since 1993,__* with no increases for inflation or rising health care costs. [11]

299.    Nonetheless, while refusing to adequately compensate nonprofit providers serving the District's most vulnerable citizens, the District opted to renew the contract of a for profit firm accused of bilking District taxpayers – *increasing the contract from $950,000 annually to $1.6 million for FY 2007 and to $2.2 million for FY 2008.*

300.    The government's decision to renew -- and significantly increase – Venable's contract contrasts sharply with its treatment of Unfoldment and other nonprofit providers and raises questions about the fairness of the District's procurement process.

**Ricardo J. and Bryan W. and Other Youths Were Harmed by the Discrimination**

301.    Unfoldment was recognized by judges, CFSA social workers, guardians ad litem, and public defenders as a 'provider of last resort' for hard to place teenage boys with substance abuse and delinquency issues. The nonprofit welcomed youths that no other group homes would accept -- boys like Ricardo J. and Bryan W.

302.    The unexpected shut down based on what now appears to be racism by contracting officials entrusted to protect the welfare of the District's most vulnerable citizens can only be

---

[11] The District's $1.5 million reform plan does not address the low-rates issue.  Almost a third of the proposed money goes to investigate the ongoing deaths of disabled residents under questionable circumstances. This includes the re-doing of past investigations tampered with by District government officials who concealed evidence and eliminated recommendations that could have prevented more deaths, according to a court monitor.

described as a monumental tragedy for the District's foster care system.

303.     CFSA's arbitrary and capricious termination, without cause, of the highly regarded Unfoldment program was devastating to Unfoldment's clients and staff who had developed a close familial relationship.

304.     Without preparing them or providing counseling of any sort, CFSA abruptly moved the youths to other group homes with no explanation, separating them from a caring environment, causing them extreme grief, distress and anxiety and compelling two of them to run away from their placements.

### Bryan W.

305.     Following his removal from Unfoldment, Bryan W. ran away from his new placement at Boys Town and stayed away for more than *three weeks.*

306.     He later admitted to sneaking into a closed Unfoldment group home to spend the night on Sunday, November 29, 1998.

307.     On December 4, 1998, Boys Town staff visited Unfoldment trying to determine Bryan's whereabouts.

### Ricardo J.

308.     Another boy, Ricardo J., age 14, who had lived in six group homes since he came into the system at the age of 9, experienced no continuity of care and severe foster care drift.

309.     He reluctantly left Unfoldment after staff encouraged him to give the new placement, Boys and Girls Club, a try.

310.     Ricardo stayed two weeks, and returned to Unfoldment on his own one night without the program's knowledge or consent.

311.     The next day Ricardo called his judge and asked for permission to stay at

Unfoldment until the court could convene an emergency hearing to determine his placement.

312.    The Court agreed.  Ricardo asked Unfoldment Executive Director to write a letter to his judge on his behalf, to which he attached his own letter.

313.    The court convened an emergency hearing on November 22, 1998; during the hearing, before then D. C. Superior Court Judge Ellen Huvelle, CFSA stated that it did not have a contract with Unfoldment.  The CFSA representative asked the Court to go into closed session and to exclude Unfoldment and Ricardo from the courtroom.

314.    During the proceedings, Ricardo's guardian ad litem, Paul Strauss, Esq. asked Unfoldment Executive Director why the program had been closed, stating "CFSA has contracts with terrible group homes and has never terminated a contract; therefore, Unfoldment must be the most terrible of the terrible."

315.    Other attorneys, judges and social services professionals undoubtedly drew similar conclusions regarding Unfoldment.

316.    Ricardo J. became emotional, telling his guardian ad litem that for the first time in five years his behavior has improved and he was happy at a placement, yet the government shuts it down.

317.    He reminded Mr. Strauss that when he complained of being physically beaten by staff of another CFSA -contracted group home, nothing was done and that group home is still open.  Ricardo asked his lawyer, "What is it man you all just don't want a program that works?"

318.    When the in camera session ended, Judge Huvelle ruled that she could not order Ricardo's return to Unfoldment because the agency did not have a contract with CFSA.

319.    But Ricardo spoke up for Unfoldment, telling his judge that he did not want to return to Boys and Girls Club; that he wanted to stay at Unfoldment and he would run away from

Boys and Girls Club if ordered by the court to return.

320.    Judge Huvelle then ordered him to stay with his mother from November 22 and return to court on December 2.  Ricardo left his mother's on November 29th and returned to one of Unfoldment's closed group homes where he stayed (without Unfoldment's knowledge) from November 29th to December 2.

321.    After learning of this on December 2, Unfoldment officials left a note on the door asking him to return to his mother and notified Judge Huvelle.

322.    Bryan W. and other youths removed from Unfoldment called regularly asking to return.  Unfoldment staff urged them to stay at their new placements and continue their progress.

323.    In written statements, Bryan W., Ricardo J. and the other boys attest that Unfoldment is run as well if not better than any other CFSA contract group home in the city.  They should know — they have lived in all of them.

324.    One cold January afternoon, Unfoldment's Executive Director was surprised to discover Ricardo sleeping in Unfoldment's closed, unheated South Capitol Street cottage – alone.  He had run away from his assigned group home once again.

### Bryan W. and Ricardo J.'s Claims are Based on Newly Discovered Evidence

325.    The seminal case establishing that municipalities may be held liable under 42 U.S.C. 1983 is Monell v. Dept. of Social Services, 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978) n25.  In that case, the Supreme Court held that although "a local government may not be sued under 1983 for an injury inflicted solely by its employees or agents," it may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694.

The Monell decision makes it clear that "local governments, like every other 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels" 436 U.S. at 690-91.   What matters is that the policy or custom is "the moving force of the constitutional violation." Id.  at 694; see also LaShawn v. Dixon, 762 F. Supp. 959; 1991 U.S. Dist. LEXIS 5300.

326.    In Lynch v. Dukakis, 719 F.2d 504 (1st Cir. 1983), the First Circuit applied the two-part test to alleged violations of the same statute at issue in this case, the federal Adoption Assistance Act.

327.    The court held that the Act confers enforceable rights upon children in the custody of states receiving federal funding under the Act. In so holding, the First Circuit relied on numerous Supreme Court decisions since 1968 that "implicitly and explicitly" have held that the rights under various provisions of the Social Security Act are privately enforceable under 42 U.S.C.1983, 719 F.2d at 510.

328.    Having determined that the Adoption Assistance Act conferred an enforceable right, the First Circuit went on to determine that Congress had not foreclosed the 1983 remedy by authorizing the Secretary of the Department of Health and Human Services to withhold or reduce federal funding under the Act when a state does not comply with its requirements. The court rejected the defendants' arguments that a cutoff in funding was the sole remedy under the Act. Instead, the First Circuit held that the issue was governed by Rosado v. Wyman, 397 U.S. 397, 25 L. Ed. 2d 442, 90 S. Ct. 1207 (1970), in which the Supreme Court held that:

> "We have considered and rejected the argument that a federal court is without power to review state welfare provisions or prohibit the use of federal funds by the States in view of the fact that Congress has lodged in the Department of HEW the power to cut off federal funds for noncompliance with statutory requirements. We are most reluctant to assume

Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program. 397 U.S. at 420."

## COUNT I

### (Unlawful Discrimination in Violation of 42 U.S.C. 1981 Based Upon Race and Sex)

329.    Paragraphs 1 through 328 are herein incorporated by reference.

330.    The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson as described herein, constitutes unlawful discrimination, harassment and retaliation against Plaintiff Unfoldment based upon the race (African-American) and sex (female) of Unfoldment's Board of Directors, pursuant to 42 U.S.C. Section 1981(a), to wit: By conduct up to and through July 1997 and continuing to the time of this lawsuit, Defendants have denied to Unfoldment and its Board the "same right ... to make and enforce contracts ... as enjoyed by white citizens ...." to "make and enforce contracts" "includes the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," as applied through Title 42, United States Code, Section 1983.

331.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT II

### (Unlawful Retaliation for the Prior Exercise of Protected Civil Rights)

332.    Paragraphs 1 through 331 are herein incorporated by reference.

The conduct of Defendants District of Columbia, Oppedisano, Osbourne Jones, Black, Grady and Jackson, as described herein, constitutes unlawful retaliation against Plaintiff Unfoldment based upon Plaintiff's prior exercise of protected constitutional and civil rights activities, to wit: By conduct up to and through July 1997, and continuing to this day, Defendants have engaged in

a course of action constituting harassment, discrimination and unlawful retaliation against Plaintiff for having engaged in protected constitutional and civil rights and specifically through the failure and refusal of Defendants to permit Plaintiff to avail itself of the fair and unbiased equal opportunity to engage in business contracting with Defendant District of Columbia.

333.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT III

### (Unlawful Conspiracy in Violation of 42 U.S.C. 1985 to Deny Plaintiff the Opportunity to Make Contracts Based Upon Race and Sex)

334.    Paragraphs 1 through 333 are herein incorporated by reference.

335.    The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson, as described herein and specifically including the conspiracy and agreement by and among the Defendants, and their aforementioned actions in furtherance of the conspiracy and agreement, to wit:  the Defendants' concerted, intentional and organized plans, efforts and actions to refuse to permit Plaintiff Unfoldment, Kemi Morten and Baker Morten to make and enforce contracts pursuant to the civil rights identified by 42 U.S.C. Section 1981, as applied by 42 U.S.C. Section 1983, constitutes an unlawful conspiracy to discriminate against Plaintiff Unfoldment based upon the race (African-American) and  sex (female) of Plaintiff's Board members Kemi Morten and Baker Morten all in violation of 42 U.S.C. Section 1985.

336.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT IV
### Negligent and/or Intentional Interference with Contractual Relations

337.    Paragraphs 1 through 336 are herein incorporated by reference.

338.     Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson, through their individual and collective actions or failure to act, as described herein, negligently and/or intentionally made Unfoldment's performance of the contract more expensive and burdensome.

339.     As established herein, all required elements of the tort of negligent and/or intentional interference with Plaintiff's contractual relations have been incorporated into this Complaint.

340.     This unlawful conduct has caused past and ongoing economic injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

### COUNT V
### Negligent and/or Tortious Interference with Business Relationships, Specifically Including Plaintiff's Expectation of Prospective Economic Advantage)

341.     Paragraphs 1 through 340  are herein incorporated by reference.

342.     The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson, individually and collectively, as described herein, constitutes a negligent and/or intentional violation of Unfoldment's lawful right to fairly, and without bias, prejudice and tortious interference, engage in the right to make contracts and establish business relationships intended and expected to result in prospective economic advantage to Plaintiff. Ulico Cas. Co.. v. Prof. 1 Indem. Agency, Inc., (1999), U.S. Dis. LEXIS 8591 (D.D.C. 1999) (TFH).   As set forth by this Court in the Ulico case, supra at 4, the components of the cited tort are as follows:

> "Under District of Columbia law, Plaintiff must allege (1) the
> existence of a valid business relationship or expectancy; (2) knowledge of
> the relationship or expectancy on the part of Defendant; (3) [negligent and/or]
> intentional interference inducing or causing a breach or termination of the
> relationship or expectancy, and (4) resultant damage.  See Bennett Entertainment Inc. v.
> Domino's Pizza, Inc., 310 U.S. App. D.C. 192, 45 F.3d 493, 499 (D.C. Cir. 1995)."

343.     As established herein, all required elements of the tort of negligent and/or tortious

54

interference with Plaintiff's reasonable expectation of prospective economic advantage have been incorporated into this Complaint.

344.    This unlawful conduct has caused past and ongoing economic injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT VI

### (Intentional Infliction of Emotional Distress)

345.    Paragraphs 1 through 344 are herein incorporated by reference.

346.    The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson as described herein, constitutes common law intentional infliction of emotional distress against Plaintiff Unfoldment and Board members Kemi Morten and Baker Morten aggravated through the Defendants' active, conspiratorial, malicious and secretive attempts to curtail or terminate Plaintiff's prospective and ongoing business relationships with Defendant District of Columbia; by Defendants' interference with and elimination of Plaintiff's reasonable opportunities to realize prospective economic advantage from such business relationships; and by Defendants' collective efforts to damage Plaintiff's personal and business reputation; all of which occurred while Defendants were generating active inducements through a conspiratorial ruse and false appearance of having an ongoing and continuing willingness to engage in such reasonably expected business relationships with Plaintiff.

347.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT VII

### (Negligent Infliction of Emotional Distress)

348.    Paragraphs 1 through 347 are herein incorporated by reference.

349.    The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson as described herein, constitutes common law negligent infliction of emotional distress against Plaintiff Unfoldment and Board members Kemi Morten and Baker Morten aggravated through the Defendants' active, conspiratorial, malicious and secretive attempts to curtail or terminate Plaintiff's prospective and ongoing business relationships with Defendant District of Columbia; by Defendants' interference with and elimination of Plaintiff's reasonable opportunities to realize prospective economic advantage from such business relationships; and by Defendants' collective efforts to damage Plaintiff's personal and business reputation; all of which occurred while Defendants were generating active inducements through a conspiratorial ruse and false appearance of having an ongoing and continuing willingness to engage in such reasonably expected business relationships with Plaintiff Unfoldment.

350.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT VIII

### Violation of Unfoldment's Liberty Interests and Due Process Right to Contract in a Fair Procurement Process

351.    Paragraphs 1-350 are herein incorporated by reference.

352.    The conduct of Defendants District of Columbia, Oppedisano, Osbourne, Jones, Black, Grady and Jackson, in violating Unfoldment's constitutionally protected liberty interests and due process rights to contract in a fair procurement process constitutes a violation of the Due Process Clause of the U.S. Constitution as applied to the  District of Columbia and the U.S. Constitution.

353.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT IX

### Breach of Quantum Meruit, Oral Contract, Detrimental Reliance

354.    Paragraphs 1-353 are herein incorporated by reference.

355.    Defendants District of Columbia, Jones, Grady and Jackson wrongfully breached their promise to pay rent for storing government inventory at Unfoldment's group homes and their promise to execute a new contract with Unfoldment. Unfoldment relied on the District of Columbia's promise to its detriment and the District of Columbia is estopped from denying responsibility for damages suffered by Unfoldment under a quantum meruit contract, unjust enrichment, oral contract or detrimental reliance theory.

356.    The conduct of Defendant District of Columbia, its employees, officials and agents in wrongfully breaching its promise to execute a new contract with Plaintiff Unfoldment and failing to compensate Unfoldment for storing government property at its group home facilities and Unfoldment's reliance on the District of Columbia's promise to its detriment  constitutes a violation of equitable state claims of the District of Columbia, brought forth herein as attendant to the causes of actions pursuant to Title 42, United States Code Sections 1981 and this Court's supplemental jurisdiction under Title 28, United States Code Section 1367.

357.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment, and its Directors Kemi Morten and Baker Morten.

## COUNT X

### Breach of  42 U.S.C. 1983, D.C. Prevention of Child Abuse and Neglect Act and Youth Residential Facilities Licensure Act

358.    Paragraphs 1-357 are herein incorporated by reference.

359.    The conduct of Defendant District of Columbia, its employees, officials and agents in negligently and/or intentionally breaching the rights of Bryan W., Ricardo J. and other youths

housed at Unfoldment by removing them from a group home placement against their will and over their stated objections in bad faith and for racially discriminatory reasons constitutes a violation of their rights under 42 U. S.C. 1983, the Fifth Amendment to the U.S. Constitution, D. C. Prevention of Child Abuse and Neglect Act, and the Youth Residential Facilities Licensure Act which explicitly provides these children with a private cause of action to sue under the Prevention of Child Abuse and Neglect Act; the Due Process Clause of the U.S. Constitution as applied to the District of Columbia, and the U.S. Constitution.

360.    This unlawful conduct caused past and ongoing economic, physical and mental injury to Plaintiffs Bryan W., Ricardo J. and other youths housed at the Unfoldment CFSA group home under Contract 7KGC09 when the Unfoldment program closed.

## COUNT XI

### Injunctive Relief – Retroactive Restoration Of Unfoldment's Real Property Tax Exemption

361.    Paragraphs 1 through 360 are incorporated herein by reference.

362.    The conduct of Defendant District of Columbia, its employees, officials and agents in revoking the real property tax exemption of Plaintiff Unfoldment, Inc. and imposing real property taxes on Unfoldment's two group homes located at 3825 South Capitol Street, S.W. and 546 Newcomb Street, S.E. is part of a pattern and practice by Defendant District of Columbia to discriminate, harass, and retaliate against Unfoldment and its Directors based upon Plaintiff's prior exercise of protected constitutional, legal and civil rights activities, to wit: By conduct up to and through December 1998, and continuing to this day, Defendants have engaged in a course of action constituting harassment and unlawful retaliation against Plaintiff for having engaged in protected constitutional, legal and civil rights, including Unfoldment's exercise of its right to sue the District of Columbia.

58

363.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## COUNT XII

### Injunctive Relief – Preclusion from Government Contracting

364.    Paragraphs 1 through 363 are incorporated herein by reference.

365.    Defendant District of Columbia, its employees, officials and agents precluded Plaintiff Unfoldment, Inc. from contracting with the District of Columbia government since December 1998, based upon Plaintiff's prior exercise of protected constitutional, legal and civil rights activities, to wit:  By conduct up to and through December 1998, and continuing to this day, Defendants have precluded Unfoldment from obtaining government contracts as part of campaign of discrimination, harassment and unlawful retaliation against Plaintiff for having engaged in protected constitutional, legal and civil rights, including Unfoldment's exercise of its right to sue the District of Columbia.

366.    This unlawful conduct has caused past and ongoing economic, physical and mental injury to Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten.

## PRAYER FOR RELIEF

367.    Paragraphs 1 through 366 are herein incorporated by reference.

368.    As a result of the injuries described herein, Plaintiff Unfoldment, Inc. respectfully prays for the following relief from this Honorable Court:  Judgment against the Defendants, jointly and severally, for Counts I through IX and XI through XII, in the following amounts:

1. Actual damages in the amount of $ $6,000,000 for loss of remainder of five-year contract for the period January 1999 through June 2002;

2. Additional damages in the amount of $10,000,000 for the loss of prospective business

opportunities from June 2002 through the present caused by the District government's preclusion of Unfoldment from contracting opportunities.

3. Punitive damages in the amount of $10,000,000 for the malicious, wanton, outrageous and reckless conduct set forth herein.

4. Additional compensatory damages of $9,000,000 for Plaintiff Unfoldment Board Members Kemi Morten and Baker Morten's mental injuries, including pain and suffering, as a result of the Defendants' conduct as identified in Counts I through IX and XI through XII.

5. Injunctive relief against Defendant District of Columbia, its officers, employees and agents, regarding any further retaliation or recurrence of the unlawful conduct against Plaintiff Unfoldment and its Directors Kemi Morten and Baker Morten as set forth in Counts I through IX and XI through XII herein.

6. Specific performance relief against Defendant District of Columbia, its officers, employees and agents, directing them to retroactively restore Unfoldment's real property tax exemption as set forth in Count XI.

7. Plaintiffs Bryan W., Ricardo J. et alia seek the following relief for damages associated with their claims as set forth in Count X; namely, an Order directing the District of Columbia to execute a grant with Plaintiff Unfoldment to develop and manage a traditional group home program for 30 older teenaged males ages 12-20 with issues of substance abuse and/or juvenile delinquency who are wards of the District's foster care system (at least 15 of whom are currently placed in out-of-state residential facilities).

8. Reasonable attorney's fees and costs.

## JURY DEMAND

Plaintiffs Unfoldment, Bryan W. and Ricardo J. respectfully request a trial by jury on all issues herein set forth, as allowable by law.

Respectfully submitted,

/s/ *Kemi Marten*

Kemi Morten, Esq.
D. C. Bar No. 272575
3709 SE 18 Place
Cape Coral, Florida 33904
Phone: (202) 536-3268 or (239) 810-4701
/s/
Brian Lederer, Esq.
D. C. Bar No. 184184
3003 Van Ness St., NW, Suite #W228
Washington, D. C. 20008
Phone: (202) 244-1715
Members of the Bar of the
United States District Court for the District of Columbia
/s/
Fania Davis, Esq.
445 Bellevue Avenue
Suite 207
Oakland, California
California State Bar 87268
*pro haec vice*

Attorneys for Plaintiffs Unfoldment, Inc.
Bryan W. and Ricardo J.
September 7, 2007

## CERTIFICATE OF SERVICE

I, Kemi Morten, hereby certify that one copy of the foregoing Complaint, was provided by first-class mail, postage prepaid, this 26th day of September 2007 to the following named counsel for Defendant District of Columbia: George Valentine, Esq., Deputy Attorney General for the District of Columbia, 441 Fourth Street, N.W., Washington, D. C. 20001.

*Kemi Morten*

Kemi Morten

**Kemi Morten**                                    *Exhibit 1*
Attorney at Law
3709 SE 18 Place
Cape Coral, Florida 33904
202-536-3268/239-810-4701

September 7, 2007

The Honorable Adrian Fenty
Mayor
District of Columbia
1350 Pennsylvania Avenue, N.W.
Washington, D. C. 20004

### *BY CERTIFIED MAIL #7007 1490 0002 4072 2982*
### *RETURN RECEIPT REQUESTED*

Dear Mayor Fenty:

    Unfoldment, individually and behalf of Bryan W. and Ricardo J., hereby files a notice of intent to file a claim for intentional and/or negligent torts as required under D. C. Code Section 12-309 and/or under the D. C. tort claims act and/or under the terms of any other applicable D. C. statute or other D.C. equivalent of the Federal Tort Claims Act.
    This case originated in the D. C. Contract Appeals Board (hereafter "Board") as a dispute between Unfoldment and CFSA over the terms of a contract to provide a 30-bed traditional group home program for older teenage boys with histories of substance abuse and delinquency. The contract, awarded following a competitive bid process, consisted of a base year in the amount of $1.7 million followed by four option years.

    In 1998, following a series of contract breaches by CFSA contracting branch chief John Oppedisano, Unfoldment complained of unfair treatment and asked CFSA General Receiver Ernestine Jones to investigate.

    After an exhaustive investigation, in June 1998, CFSA determined that "certain unnamed Agency contracting officials held an unreasonable hostility toward Unfoldment." Despite repeated requests from Unfoldment, Defendants refused to disclose the names of the hostile officials or the nature of their hostility.

    Nonetheless, four months later, Defendants opted not to renew Unfoldment's contract. At the time, Unfoldment was one of the largest African-American controlled group home providers under contract with CFSA and the only provider whose contract was not renewed after the base year. The Board dismissed Unfoldment's complaint.

    On October 20, 2006, the D. C. Court of Appeals reversed and remanded the Board's decision, ruling that Unfoldment is entitled to recover the minimum order requirement set forth in the contract. The Court of Appeals also ruled that Unfoldment

07 1717

**FILED**

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

has the right to sue the District for three additional causes of action: breach of contract, breach of contract in bad faith and breach of a quantum meruit action. *Unfoldment, Inc. v. D.C. Contract Appeals Board 909 A.2d 204 (2006).*

While preparing for litigation following remand, Unfoldment discovered the May 2006 decision in *Mintz v. D.C. 2006 U.S. Dist. LEXIS 34446* in which U.S. District Court Judge Oberdorfer made the following findings.[1]  Neither the Board nor the Court of Appeals considered this evidence prior to rendering their decisions.

Based on this recently discovered evidence, Unfoldment hereby gives notice of its intent to file the following claims against the District of Columbia consistent with notice previously provided to your Office by service on the Office of Attorney General for the

---

[1] Oppedisano "referred to Plaintiff Mintz and other African-Americans, including other African-American employees of the agency, as 'niggers' and 'dumb ass niggers.'"

Oppedisano told Mintz that "'[y]ou are just like the rest of these people here – a dumb ass nigger.'"

Oppedisano, in the presence of both plaintiffs, referred to another employee as a "Muslim nigger.'"
Oppedisano made other racist remarks in the workplace.

After Mintz began to protest the racial comments, Oppedisano and Osbourne began to harass Mintz, arguably in an attempt to provoke him to anger.  These comments included vulgar sexual and racial references.  For example, Osbourne asked Mintz whether, as a "tall, Black man" he "liked having it up the ass."

In the restroom, Oppedisano said to Mintz, "I like it anal, Reginold, don't you want to give it to me? You're a black stud."  Oppedisano also sexually propositioned Mintz on other occasions.

In addition, on one occasion Osbourne picked up a picture of Mintz's son on his desk, and told Mintz that Osbourne "liked having sex with boys."  Osbourne also asked Mintz whether he "liked boys."

At this point Darbeau interceded and took Mintz for a walk around the block so that he would calm down.

As a result of the foregoing facts, the "work environment caused particular distress to the African-American females in the unit, one of whom was Muslim."

In response, both plaintiffs reported the behavior of Oppedisano and Osbourne to Farouk Hosein, who was Oppedisano's direct supervisor.

Following the sexual comments described above, Mintz `reported Oppedisano to the Agency's Intake and Assessment Desk, which is where employees filed complaints.

Mintz was assured that someone would take action, but no action in fact occurred.  On November 15, 1996, Mintz filed a formal EEO complaint with the Agency.  Mintz was immediately placed on administrative leave.  The Director of Personnel, Mary Montgomery, testified that the person *under investigation* is normally placed on administrative leave – **not** the person who filed a complaint.  *[Emphasis added]*.

On November 21, 1996, the Receivership sent a termination letter to Mintz.

District of Columbia:

    1.  tortious interference with Unfoldment's prospective economic advantage;

    2.  fraudulent, deceptive and misleading execution of the contract.

    3.  slander, libel and defamation of Unfoldment, Inc.

    4.  negligent and/or intentional infliction of emotional distress based upon the common law of the District of Columbia and D.C. Code 12-309.

In addition, Unfoldment hereby gives notice of intent to file a claim for compensatory and punitive damages (against government officials in their personal capacity) arising under 42 U.S.C. 1981 and 42 U.S.C. 1985 and related claims. Specifically, those claims include the following, among others:

    5.  violation of Plaintiff Unfoldment's constitutionally protected due process and liberty interests based upon the Fourteenth Amendment of the United States Constitution as applied to the District of Columbia through the Fifth Amendment and 42 U.S.C. 1981 and 42 U.S.C.1985.

    6. wrongful breach of oral contract to pay rent to store government inventory at Unfoldment's group homes and to execute a new contract with Unfoldment and Unfoldment's reliance thereon to its detriment under a quantum meruit contract or promissory estoppel/detrimental reliance theory.

    7.  wrongful revocation of Unfoldment's real property tax exemption.

    8.  breach of the rights of Ricardo J., Brian W. and other youths housed at Unfoldment, Inc. based upon the D. C. Prevention of Child Abuse and Neglect Act and the Youth Residential Facilities Licensure Act which explicitly provide these children with a private cause of action to sue under the Prevention of Child Abuse and Neglect Act, 42 U.S.C. 1983, and the Due Process Clause of the U.S. Constitution as applied to the District of Columbia, and the U.S. Constitution.

    9.  violations of Unfoldment's liberty interests and due process right to contract in a fair procurement process as guaranteed under the Fifth and Fourteenth Amendment of the U.S. Constitution; and

    10. breach of quantum meruit contract, breach of oral contract to execute new contract and related state claims.

Sincerely,

/S/

Kendi Morten,  Counsel for Unfoldment, Inc.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

UNFOLDMENT, INC. et alia

*ii001*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Kemi Morten, Esq. 3709 SE 18 Place Cape Coral,
Florida 33904 202-536-3268; 239-810-4701

**DEFENDANTS**

DISTRICT OF COLUMBIA, et alia

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

Case: 1:07-cv-01717
Assigned To : Oberdorfer, Louis F.
Assign. Date : 9/26/2007
Description: Civil Rights-Non-Employ.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government
  Plaintiff
- ◉ 3 Federal Question
  (U.S. Government Not a Party)
- ○ 2 U.S. Government
  Defendant
- ○ 4 Diversity
  (Indicate Citizenship of
  Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff))
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ✍ E. General Civil (Other) OR ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

No Summons Issued

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation) | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act) | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |
|  | *(If pro se, select this deck)* | *(If pro se, select this deck)* |  |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☒ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original
Proceeding
O 2 Removed
from State
Court
O 3 Remanded from
Appellate Court
O 4 Reinstated
or Reopened
O 5 Transferred from
another district
(specify)
O 6 Multi district
Litigation
O 7 Appeal to
District Judge
from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. 1981, 1985 Unlawful Discriminatin Based on Plaintiff's Race and Sex Through the Unlawful Opportunity to Make and Enforce Contracts

---

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in compl. |
|---|---|---|---|
|  |  | **JURY DEMAND:** | YES ☒  NO ☐ |

**VIII. RELATED CASE(S) IF ANY**      (See instruction)      YES ☒   NO ☐   If yes, please complete related case form.

DATE ~~8/20/07~~
9-26-07      SIGNATURE OF ATTORNEY OF RECORD      *Kerrie Marter Reed*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.